Jose Angel MORENO, TDCJ
No. 000859, Petitioner,

v.

Douglas DRETKE, Director, Texas De-
partment of Criminal Justice, Correc-
tional Institutions Division, Respon-
dent.

No. CIV.SA–00–CA–1058–XR.

United States District Court,
W.D. Texas,
San Antonio Division.

March 17, 2005.

J. Scott Sullivan, Attorney at Law, San Antonio, TX, for Petitioner.

Tina J. Dettmer, Office of the Attorney General, Austin, TX, for Respondent.

## MEMORANDUM OPINION AND ORDER

RODRIGUEZ, District Judge.

Petitioner Jose Angel Moreno filed this federal habeas corpus action pursuant to 28 U.S.C. section 2254 challenging his 1987 Bexar County conviction for capital murder and sentence of death. For the reasons set forth herein, petitioner is entitled to neither habeas corpus relief nor a certificate of appealability from this Court.

## I. Statement of the Case

### A. The Crime and Aftermath

Shortly after his arrest on February 7, 1986, petitioner Jose Angel Moreno gave law enforcement officers a written statement in which he confessed to having kidnaped, fatally shot, and buried John Manuel Cruz in a shallow grave.[1]

On April 2, 1986, a Bexar County grand jury indicted petitioner in cause no. 86–CR–1042 on a charge of capital murder, to wit, petitioner's murder of Cruz in the course of committing and attempting to commit Cruz's kidnaping.[2]

### B. Petitioner's Motions to Suppress

Petitioner's trial counsel filed three motions seeking to suppress petitioner's confession as well as the murder weapon, which was recovered from beneath the mattress in petitioner's bedroom during a search of petitioner's residence on February 7, 1986.[3] Beginning July 14, 1986, the state trial court held a three-day hearing on petitioner's motions to suppress, during

---

1. Petitioner's confession was admitted into evidence at petitioner's trial as State's Exhibit No. 3 and read in its entirety in open court. *See* Statement of Facts from petitioner's trial (henceforth "S.F. Trial"), Volume XXIV, at pp. 5142–51.

 In his written confession, petitioner explains that (1) he made the decision to kidnap and collect a ransom on John Cruz and then to kill Cruz, (2) on or about January 12, 1986, he duped a pair of teenage acquaintances into digging a hole for him in an isolated location, (3) he intended to use this hole as Cruz's grave after he killed Cruz, (4) he made several efforts to kidnap Cruz on Cruz's way home from work but failed until the night of January 21, (5) on that occasion, petitioner placed rocks across the road near Cruz's home and, when Cruz exited his vehicle to move the rocks, petitioner ordered Cruz back into his car at gunpoint, handcuffed Cruz, and drove Cruz to the isolated location of the shallow grave, (6) petitioner then marched the now-blind-folded and still-handcuffed Cruz to the edge of the grave, where petitioner shot Cruz, (7) Cruz fell face-forward into the grave but flipped over on his back, (8) after removing the handcuffs, petitioner covered Cruz's body with dirt and debris, (9) petitioner then drove to a location where he had stashed his father's vehicle, locked and left Cruz's car there, but took Cruz's radio with him, (10) around 3 a.m., petitioner made his first telephone call to a neighbor of Cruz, (11) shortly thereafter, petitioner made a telephone call to Cruz's parents, demanding a ransom for Cruz's release, (12) after negotiating a ransom of $26,000, petitioner told Cruz's parents he would call back around noon, (13) when he called back, Cruz's parents told petitioner they did not have the money because it was in a trust fund, (14) petitioner told them "you killed him, not us" and hung up, (15) petitioner drove past Cruz's residence and saw a police vehicle parked there, and (16) he later sold Cruz's radio to an unidentified person. *Id.*

 For unknown reasons, the exhibits from petitioner's trial are included in two separate volumes in the Statement of Facts from petitioner's trial. The first such volume is marked as "Volume XXI–A of XXI [sic] Volumes" and includes most of the photographic exhibits admitted into evidence. The second exhibit volume is marked as "Volume XXX of XXX Volumes" and includes petitioner's three-page confession, i.e., State's Exhibit no. 3.

2. Trial Transcript at p. 10; State Habeas Transcript at p. 90.

3. Trial Transcript at pp. 115–17, 125–27, and 129–31. The thrust of all three motions was that there was insufficient information in the

which it heard extensive testimony from the law enforcement officers who investigated Cruz's kidnaping and murder, as well as the magistrate who issued the search/arrest warrant in question.[4] On August 5, 1986, the state trial court heard oral argument on petitioner's motions to suppress.[5] Finally, on August 28, 1986, the state trial court denied all three motions to suppress.[6]

## C. Guilt–Innocence Phase of Trial

The guilt-innocence phase of petitioner's capital murder trial began on November 17, 1986. In addition to petitioner's confession and testimony concerning the circumstances surrounding the discovery of Cruz's body, petitioner's jury heard extensive testimony corroborating petitioner's confession, including (1) the medical examiner's findings that Cruz sustained three relatively close range gunshot wounds to the back of the head, two of which penetrated the skull and either of which would have proved fatal,[7] (2) the findings of a ballistics expert that the bullet recovered from Cruz's body during autopsy had been fired from the handgun found under petitioner's mattress during a search of petitioner's residence,[8] (3) testimony from Cruz's neighbors and others that they observed large rocks positioned across their street on several evenings immediately prior or to Cruz's abduction,[9] (4) testimony from

---

affidavit supporting the search and arrest warrant executed on February 7, 1986 to establish probable cause for either petitioner's arrest or the search of petitioner's residence.

4. S.F. Trial, Volume III, testimony of Robert O'Hara at pp. 172–211; testimony of Fred Moreno at pp. 211–50; testimony of Manuel Garcia at pp. 250–70; Volume IV, testimony of Albert Silva at pp. 273–415; testimony of Salvador S. Gonzales at pp. 416–71; testimony of Salvador Marin at pp. 471–540; Volume V, testimony of Salvador Marin at pp. 543–711; testimony of Manuel Garcia at pp. 711–14; testimony of Barbara Brame at pp. 715–20; and testimony of Jack Summey at pp. 721–34.

5. See Statement of Facts from Hearing on Pretrial Motions held August 5, 1986, at pp. 2–25. For unknown reasons, the verbatim transcript from that hearing was not made a part of the Statement of Facts from petitioner's trial court proceedings but, rather, was transcribed separately.

6. S.F. Trial, Volume VI at pp. 737–39.

7. S.F. Trial, Volume XIX, testimony of Vincent DiMaio at pp. 3875–3918. Dr. DiMaio testified that he removed a .44 caliber bullet, which he identified at trial as State's exhibit no. 69, from Cruz's body during his autopsy. *Id.* at pp. 3896–3900. He testified further that Cruz died as a result of gunshot wounds to the head. *Id.* at p. 3904.

8. More specifically, the prosecution's ballistics expert testified that a bullet that Dr. DiMaio removed from Cruz's body during autopsy (i.e., State's Exhibit no. 69) had been fired from a handgun recovered by law enforcement officers during a search of petitioner's residence on February 7, 1986 (i.e., State's exhibit no. 9). S.F. Trial, Volume XXIII, testimony of Richard Stengel at pp. 4823–26 & 4832–40.

A Bexar County Sheriff's Deputy testified that he found a .44 caliber handgun, which he identified as State's exhibit no. 9, under a mattress while helping to execute a search warrant of petitioner's residence for precisely such a weapon on February 7, 1986. S.F. Trial, Volume XXIII, testimony of Fred Moreno at pp. 4807–09.

9. One prosecution witness testified that (1) he observed several rocks laid all the way across the road where Cruz lived when he attempted to leave a relative's home during the early morning hours of January 20, 1986, (2) the rocks were large enough to cause a car problems and completely blocked the street, (3) as he approached the rocks, he observed the driver of a vehicle coming the opposite direction exit his vehicle and move the rocks. S.F. Trial, Volume XIX, testimony of Arnold Garza at pp. 3954–66.

Cruz's next door neighbor testified that (1) during the early morning hours of January 21, 1986, he encountered five, heavy, large rocks blocking the bridge leading into their

Cruz's neighbors that they received a telephone call during the early morning hours of January 22, 1986 from someone claiming to have Cruz and asking for the telephone number of Cruz's parents,[10] and (5) testi-

subdivision, (2) he had to stop his vehicle to move the rocks to get back on to the island where he and Cruz lived, and (3) Cruz, who was traveling in the same direction, stopped his vehicle directly behind his and waited for him to move the rocks and then proceed. *Id.,* testimony of Richard Solis, Jr. at pp. 3972–84.

Another of Cruz's neighbors testified that (1) his father took him to a concert at approximately 7:30 p.m. on January 19, 1986 and they observed no rocks on the road as they left their neighborhood, (2) when they returned at approximately 1:30 a.m. on January 20, 1986, they found eight-to-nine rocks near their home blocking their return that he had to move before they could proceed, and (3) he observed no rocks on the road when he went to and came home from school on January 20, 1986. S.F. trial, Volume XX, testimony of David Arnold Solis at pp. 3989–96 & 4004–09. That witness' father testified to observing similar events as they drove into and out of their subdivision on the night of January 19–20, 1986. S.F. Trial, Volume XXII, testimony of Ishmael Solis at pp. 4646–49.

**10.** More specifically, Ishmael Solis testified that he answered the telephone around 3:30 a.m. on January 22, 1986 and a voice he identified as the same voice recorded on State's exhibit no. 102 informed him "We have John and we want his mother's phone number," that he woke his son David to get the Cruz family's phone number, and when he asked the caller why he wanted the Cruz family's number, the caller responded "Because we have got John." S.F. trial, Volume XXII, testimony of Ishmael Solis at pp. 4650–58.

Ishmael's son David testified that his father woke him on the night in question, inquired regarding the Cruz family's unlisted phone number, and he gave his father the number. S.F. Trial, Volume XX, testimony of David Arnold Solis at pp. 3996–98.

**11.** A San Antonio Police Officer testified that he set up a telephone recording device at Cruz's home on the morning after Cruz's family received the first ransom call and instructed both the resident and a detective at the residence how to use the device. S.F. Trial,

mony from several different persons, including petitioner's aunt, identifying petitioner as the person whose voice could be heard on a police tape-recording of a ransom demand telephone call placed to Cruz's parents on January 22, 1986.[11]

Volume XX, testimony of Alvin C. Brown, II at pp. 4209–19. Another San Antonio Police Officer identified State's exhibit no. 102 as the cassette tape recording of the telephone calls received at Cruz's residence in the hours after Cruz's family received the initial ransom demand call. S.F. Trial, Volume XXII, testimony of Art Trevino at pp. 4605–13. Officer Trevino also identified State's exhibit no. 141 as an exact duplicate of State's exhibit no. 102.

State's exhibit no. 102 was played, outside the presence of the jury, during petitioner's trial. S.F. Trial, Volume XXII at pp. 4583–94. Thereafter, only small portions of that recording were played back in the jury's presence for the purpose of permitting various witness to identify the voice thereon.

Cruz's 15–year–old sister testified that the male voice recorded on State's exhibit no. 102 demanding money for the return of her brother was the same male voice she heard when she answered the telephone at her residence during the early morning hours of January 22, 1986. S.F. Trial, Volume XXII, testimony of Luzelema Cruz at pp. 4554–59.

Cruz's step-father testified that State's exhibit no. 102 was an accurate recording of his conversation just after noon on January 22, 1986 with a male who demanded money in exchange for Cruz's safe return and the male voice demanding money on the tape recording was the same voice he heard when summoned to the phone earlier that same day by his step-daughter and wife. S.F. Trial, Volume XXII, testimony of Carlos C. Hernandez at pp. 4669–72 & 4678–81.

Cruz's mother also identified the male caller's voice on State's exhibit no. 102 as the same voice she heard when her daughter awakened her and gave her the telephone early on January 22, 1986. S.F. Trial, Volume XXIV, testimony of Dora Cruz Hernandez at pp. 5298–5303.

Petitioner's aunt identified the voice of the caller saying "you have killed him" on State's exhibit no. 102 as petitioner's. S.F. Trial, Volume XXIII, testimony of Mary Lamas at pp. 4757.

Following an extended continuance caused by the illness of a juror and a stroke suffered by the trial judge's spouse, petitioner's trial resumed on January 5, 1987. The jury rendered its verdict on January 7, 1987, finding petitioner guilty of capital murder.

## D. *Punishment Phase of Trial*

The following day, the punishment phase of petitioner's trial began. During that phase of trial, the jury heard extensive testimony detailing (1) the discovery of numerous weapons in petitioner's cell or on petitioner's person during his pretrial detention,[12] (2) numerous instances of violent conduct by petitioner during his pretrial detention and trial,[13] (3) numerous

---

Petitioner's close friend Celestino Pardo also identified petitioner's voice as that of the person making the ransom demand on State's exhibit no. 102. S.F. Trial, Volume XXII, testimony of Celestino M. Pardo at p. 4697.

**12.** A Bexar County Adult Detention Center ("BCADC") guard testified that he found petitioner in possession of a five-to-six inch metal "shank" on April 1, 1986. S.F. Trial, Volume XXVII, testimony of Michael A. Ramirez at pp. 5543, 5549, and 5567.

Another BCADC guard testified that (1) during a search of petitioner's cell on April 17, 1986, he observed a 12–foot length of 14–gauge wire rolled up inside a coffee cup, (2) the wire had apparently been ripped from an electrical conduit junction box after a metal pipe containing the wire had been pulled down from the ceiling, (3) during a search of petitioner's cell on May 7, 1986, he discovered a piece of broken glass, a mirror, and several plastic spoons that had been shaped into six-to-eight inch blades by melting, and (4) the plastic blades were sharp-edged and fully capable of being used to stab a person. *Id.*, testimony of Kenneth Vogel at pp. 5595–5611.

Another BCADC guard testified that (1) during a search of petitioner's cell in May 1986, he discovered a "shank" under the mattress, (2) the weapon consisting of a piece of ridged metal that had been torn from the baseboard of the cell with a cloth wrapped around one end to form a palm grip or handle, (3) while the other end of the shank had not been sharpened to a point, it was fully capable of being used to deliver a blow to another person and could be sharpened to a point, (4) he also discovered a five-inch long piece of thin, oblong glass, and (5) he also discovered a pair of homemade dice carved from soap, 14 cold tablets, a couple aspirin, and an excessive amount of books and papers wrapped in plastic. *Id.*, testimony of Rodolfo Lopez at pp. 5630–33, 5637–40.

Another BCADC guard testified that, on July 7, 1986, during a routine search of petitioner's person following petitioner's return from court, he discovered a pair of stainless steel handcuffs secreted in the groin area of petitioner's clothing. *Id.*, testimony of M. Zapata at pp. 5618–19.

**13.** A BCADC guard testified that on June 12, 1986, he witnessed the petitioner violently break the sink off the wall of his cell with his bare hands and then tear the sink apart and on another occasion, he overheard petitioner threaten a female jail guard. S.F. Trial, Volume XXVII, testimony of M. Zapata at pp. 5614–16, 5619, and 5627–28.

Another BCADC guard testified that (1) on April 10, 1986, when ordered to pack his property in anticipation of being moved out of administrative segregation, petitioner grabbed a hot cup of coffee and threw it in a guard's face, (2) petitioner was not moved after that incident but remained in administrative segregation, and (3) seven days later, a search of petitioner's cell revealed the missing length of wire taken from an electrical conduit. *Id.*, testimony of Frank V. Vehle at pp. 5657–65.

Three BCADC guards testified about an incident on November 24, 1986 in which (1) petitioner refused to comply with direct orders to leave his cell and became verbally abusive towards guards, (2) two guards were forced to grab petitioner's arms and carry him out of his cell, (3) petitioner fought their efforts to remove him from his cell and attempted to strike one of the guards in the chest, (4) after his removal from his cell, the guards put him down and a third guard attempted to secure handcuffs on petitioner, (5) petitioner then back-kicked one of the guards in the groin, and (6) after being forcibly moved to another cell, petitioner broke the toilet in his new cell into pieces and threw pieces of the broken porcelain into the hallway, forcing the water in his cell to be turned

instances of petitioner unlocking his handcuffs or those of other inmates,[14] (4) an escape attempt petitioner made less than two months after his arrest,[15] (5) multiple instances in which petitioner jammed the door to his cell, preventing the door from closing and locking properly,[16] (6) threats petitioner made to guards and an acquaintance during his pretrial detention,[17] (7) an

off. *Id.*, testimony of Timothy S. Braun at pp. 5683–94; testimony of Ronald E. Nelson at pp. 5784–94; testimony of Christian P. Purcell at pp. 5818–22.

14. A BCADC inmate testified that on July 14, 1986, he observed petitioner attempting to pick his leg irons with a paper clip and once he arrived at the courthouse, he observed the petitioner pick and remove his own handcuffs, as well as those of three other prisoners housed in the courthouse lockup. S.F. trial, Volume XXVIII, testimony of Antonio Vera at pp. 5696–5713.

A BCADC guard testified that on November 15, 1986, he found a paper clip hidden in petitioner's groin area and that the petitioner told him "There is no handcuffs that can hold me." S.F. trial, Volume XXVII, testimony of Raymond Ortega, Jr. at pp. 5647–56.

A Bexar County Courthouse security office testified (1) about an incident on January 7, 1987 in which he observed an inmate squatting close to petitioner in the courthouse lock-up with one handcuff unfastened and, after he re-fastened that inmate's handcuffs, he returned moments later to find the same inmate's handcuffs once more half-off, (2) a search of petitioner on that date yielded a paperclip that had been bent into a hook shape, (3) the following date, the petitioner motioned for him to approach the hold-over cell where petitioner was housed and, when he did so, petitioner showed the officer that his handcuffs were partially off, (4) petitioner told the officer "I thought these handcuffs were good," and (5) a strip-search of petitioner produced nothing until petitioner identified a pair of paper clips, one hidden in petitioner's tennis shoe and the other concealed in a shoe lace. S.F. Trial, Volume XXVIII, testimony of Dan S. Vela at pp. 5739–66.

Another Courthouse security officer testified that (1) on the morning of January 9, 1987, he walked past petitioner's cell and observed that the petitioner's handcuffs were fully on, (2) approximately eight or nine minutes later, the petitioner's handcuffs were fully off, and (3) handcuffs can be used as a weapon. *Id.*, testimony of Jesse Garcia at pp. 5767–73.

15. More specifically, a BCADC guard testified that (1) on the night of April 1, 1986, after all cell doors had been locked for the evening, he observed nothing unusual during a routine inspection of the third floor of that facility, (2) approximately fifteen minutes later, however, on his next inspection, he found a wet and slicked down petitioner outside his cell in the hallway, (3) petitioner wore only his shorts and had a strip of cloth tied around his waist securing a five-to-six inch metal "shank," (4) petitioner's right hand was bleeding, (5) the glass in the window directly adjacent to where petitioner was standing had been broken out, (6) a sheet had been stuffed through the shutters into the window, and (7) he believed petitioner could have slipped between the shutters and slid out the broken window. S.F. Trial, Volume XXVII, testimony of Michael A. Ramirez at pp. 5535–71.

16. A BCADC guard testified that on May 7, 1986, petitioner's cell door would not properly close because strands of metal had been wrapped around portions of the door. S.F. Trial, Volume XXVII, testimony of Kenneth Vogel at pp. 5601–04.

Another BCADC guard testified that, on November 24, 1986, petitioner's cell door had been jammed with a paper clip shaped into a hook but, once the paper clip was removed, the door worked properly. S.F. Trial, Volume XXVIII, testimony of Christian P. Purcell at pp. 5818–21 & 5823.

17. A BCADC guard testified that he overheard petitioner threaten a female guard. S.F. Trial, Volume XXVII, testimony of M. Zapata at p. 5619.

Another BCADC guard testified that petitioner threatened him directly. S.F. Trial, Volume XXVIII, testimony of Christian P. Purcell at p. 5822.

Petitioner's former employer testified that, in a telephone conversation during petitioner's pretrial detention, the petitioner had threatened to have him killed if he testified regarding a plan petitioner had described to him in which petitioner intended to disable an armored car and rob its occupants. *Id.*, testi-

incident in which petitioner faked a suicide attempt,[18] and (8) an incident during trial in which petitioner successfully posed as an another inmate and obtained access to a less-secure portion of the jail.[19] The jury also heard testimony from petitioner's family and friends to the effect that they believed petitioner was not a violent person and could be rehabilitated.[20]

On January 13, 1987, the jury returned its verdict at the punishment phase of trial, finding that (1) petitioner had deliberately caused Cruz's death and (2) there was a probability that petitioner would commit criminal acts of violence that would constitute a continuing threat to society.

### E. Petitioner's Motion for New Trial

On February 19, 1987, the state trial court held an evidentiary hearing on petitioner's motion for new trial and denied it.[21]

### F. Direct Appeal

Petitioner appealed his conviction and sentence. In an opinion issued April 7, 1993, the Texas Court of Criminal Appeals affirmed both. *Moreno v. State,* 858 S.W.2d 453 (Tex.Crim.App.1993). On No-

---

mony of James Sickafus at pp. 5867–69 & 5873.

**18.** More specifically, a BCADC guard testified about an incident in June, 1986, in which (1) petitioner tied a sheet under his arms and tied the other end to the ceiling of his cell, (2) petitioner put his uniform back on, (3) petitioner pretended to be unconscious when a guard walked past his cell, and (4) when a guard summoned emergency medical personnel and opened petitioner's cell, petitioner opened his eyes and grinned at him. S.F. Trial, Volume XXVIII, testimony of Carlos M. Santiago at pp. 5828–35.

**19.** A BCADC guard testified about an incident on November 17, 1986 in which petitioner, who was by then assigned to the administrative segregation unit on the BCADC's fifth floor, successfully posed as another inmate and obtained access to the other inmate's cell on the fourth floor. S.F. Trial, Volume XXVIII, testimony of Ronald Nelson, at pp. 5778–82.

**20.** Petitioner's father testified that (1) he and his wife adopted petitioner in February 1968, (2) his wife died in 1983 after a long illness, (3) petitioner attended high school but did not graduate, (4) he believed petitioner could be rehabilitated, and (5) he did not believe his son murdered John Cruz. S.F. Trial, Volume XXIX, testimony of Elias G. Moreno at pp. 5899–5912 & 5925–26. Petitioner's godfather testified that petitioner was a good boy, very polite, and respectful. *Id.,* testimony of Luis Resendez at pp. 5929–31. Petitioner's former baby-sitter testified that petitioner was always polite and very smart. *Id.,* testimony of Virginia Resendez at pp. 5934–35. A family friend testified that petitioner took his mother's death very hard. *Id.,* testimony of Inez Resendez, at pp. 5937–40. Two BCADC chaplains testified that they each believed petitioner's expressions of interest in the scripture were sincere and that they believed petitioner could be rehabilitated. *Id.,* testimony of Genaveve Drymala, at pp. 5942–52; testimony of James Daniels, at pp. 5953–55. A neighbor of petitioner testified that she had known petitioner his whole life, that petitioner took his mother's death hard, but she believed petitioner could learn to be a better person. *Id.,* testimony of Yolanda Guerra at pp. 5967–70.

**21.** Petitioner's motion for new trial was filed February 11, 1987, and listed as grounds for relief contentions that (1) a member of petitioner's jury saw petitioner being escorted in handcuffs and leg chains from the courthouse one evening during trial, (2) the trial court erred in refusing to appoint a new investigator for petitioner after petitioner's original investigator requested to be discharged, and (3) the trial court erred when it refused to give petitioner's requested jury instructions regarding extraneous offenses. Trial transcript at pp. 260–61.

At the evidentiary hearing held February 19, 1987, however, the juror in question testified that while she briefly glimpsed petitioner and a guard leaving the courthouse one evening, she did not recall seeing any handcuffs or leg chains on petitioner and believed petitioner was dressed as he had been during

vember 8, 1993, the United States Supreme Court denied petitioner's petition for writ of certiorari. *Moreno v. Texas,* 510 U.S. 966, 114 S.Ct. 445, 126 L.Ed.2d 378 (1993).

## G. *First Federal Habeas Proceeding*

Petitioner filed a federal habeas corpus action in this Court collaterally attacking his capital murder conviction and sentence of death. That action was docketed as cause no. SA–94–CA–31–HG. In an Order issued December 1, 1994, this Court, *per* the late Judge H.F. Garcia, granted petitioner's motion for leave to dismiss that proceeding without prejudice so that petitioner could return to the state courts and exhaust available state habeas corpus remedies.

## H. *First State Habeas Proceeding*

On January 12, 1996, petitioner filed his first application for state habeas corpus relief.[22] On April 14, 1997, the state trial court held an evidentiary hearing.[23] On

May 24, 2000, the state habeas trial court issued its findings of fact, conclusions of law, and recommendation that petitioner's state habeas application be denied.[24] In an unpublished Order issued September 13, 2000, the Texas Court of Criminal Appeals denied petitioner state habeas corpus relief.[25]

## I. *The Current Federal Habeas Proceeding*

On September 25, 2000, petitioner filed a motion for appointment of counsel in this Court. In an Order issued September 28, 2000, this Court appointed counsel for petitioner and set deadlines for the filing of petitioner's federal habeas corpus petition. Petitioner filed his initial petition for federal habeas corpus relief on June 29, 2001.[26] Respondent filed an answer and motion for summary judgment on November 29, 2001. Petitioner responded thereto on March 8, 2002.

On September 30, 2002, this Court granted petitioner's motion to hold this

trial. S.F. trial, Volume XXIX, testimony of Cheryl A. Ivy at pp. 6075–82.

**22.** State Habeas Transcript at pp. 1–55. Petitioner presented approximately nineteen claims for relief.

**23.** The Statement of Facts from the evidentiary hearing is found in the volume marked "Statement of Facts Volume II of III Volumes" found among the papers relating to petitioner's first state habeas corpus proceeding submitted to this Court by respondent. For ease of reference, all further references herein to this hearing record will be to "S.F. State Habeas Hearing."

During that hearing, the state habeas court heard testimony from (1) a member of petitioner's petit jury regarding discussion of parole eligibility during the jury's deliberations, (2) the estranged wife of prosecution witness Celestino Pardo regarding Pardo's alleged confession to her that he and Armando Olivares had actually shot Cruz while petitioner was away from the murder scene making the ransom demand telephone calls, (3) petition-

er's state habeas investigator, and (4) two medical records custodians regarding the medical records of petitioner's adopted mother.

**24.** State Habeas Transcript at pp. 101–28.

**25.** *See Ex parte Jose Angel Moreno,* App. No. 25,897–01 (Tex.Crim.App. September 13, 2000). A copy of that Order appears among the state court record relating to petitioner's first state habeas corpus proceeding submitted to this Court by respondent on August 3, 2001. In its *per curiam* Order, the Texas Court of Criminal Appeals implicitly adopted the fact findings and legal conclusions made by the state habeas trial court. *Id.*

**26.** Docket entry no. 8. As grounds for relief therein, petitioner argued that (1) his appellate counsel rendered ineffective assistance, (2) his Fourth Amendment rights had been violated by virtue of the state trial court's denial of his motions to suppress, (3) prosecution witness Celestino Pardo testified falsely at petitioner's trial, and (4) the state trial

cause in abeyance pending petitioner's return to state court to exhaust state remedies on petitioner's claim that he is mentally retarded and, pursuant to the Supreme Court's opinion in *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), exempt from the death penalty.

## J. *Second State Habeas Corpus Proceeding*

In an unpublished *per curiam* Order issued September 10, 2003, the Texas Court of Criminal Appeals dismissed petitioner's *Atkins* claim based on state writ-abuse principles, yet also specifically held that petitioner had failed to make a *prima facie* showing sufficient to support an *Atkins* claim.[27]

## K. *Return to This Court*

Following the dismissal of petitioner's second state habeas corpus application, petitioner returned to this Court and sought leave to amend his pleadings. This Court granted petitioner's request and, on September 10, 2003, petitioner filed his first amended federal habeas corpus petition.[28]

Petitioner filed his second amended federal habeas corpus petition on May 14, 2004, arguing therein that (1) petitioner's execution is barred by the Supreme Court's holding in *Atkins* because petitioner is mentally retarded, (2) his appellate counsel rendered ineffective assistance by failing to (a) ensure that the search/arrest warrant affidavit was included in the state appellate record, (b) investigate and present evidence in the course of petitioner's motion for new trial regarding the jury's improper discussion of parole eligibility during its deliberations, (c) raise points of error regarding the erroneous definitions of the culpable mental states included in the guilt-innocence phase jury instructions, (3) the state trial court erred in failing to grant petitioner's motions to suppress, (4) prosecution witness Celestino Pardo committed perjury during petitioner's trial, and (5) the state trial court constructively denied petitioner effective assistance of counsel when it failed to appoint a new investigator for petitioner's defense team mid-trial.[29]

On August 31, 2004, respondent filed his answer and motion for summary judgment.[30] On January 14, 2005, petitioner filed his response thereto.[31] On February 7, 2005, petitioner filed an amended reply to respondent's motion for summary judgment.[32]

court erred when it refused to appoint a new investigator for petitioner's defense team.

**27.** *Ex parte Jose Angel Moreno*, No. 25,897–02 (Tex.Crim.App. September 10, 2003). More specifically, the Texas Court of Criminal Appeals held that no evidentiary hearing was necessary to resolve petitioner's *Atkins* claim because petitioner had failed to set forth "sufficient specific facts to raise a bona fide claim of mental retardation."

**28.** Docket entry no. 37. As grounds for relief, petitioner's first amended federal habeas corpus petition re-asserted all of his claims from his initial petition and added an *Atkins* claim.

Contemporaneously with the filing of petitioner's first amended federal habeas corpus petition, petitioner sought leave to file a second amended petition. This Court granted that request in an Order issued September 16, 2003.

**29.** Docket entry no. 44. Pages 13–34 of petitioner's Second Amended Petition, while purporting to discuss ineffective assistance principles generally, include numerous references to facts and allegations in another case pending before this Court in cause no. SA–02–CA–386–OG and appear to have been inadvertently inserted into petitioner's discussion. Insofar as those references relate exclusively to the facts in the other proceeding, they will be disregarded.

**30.** Docket entry nos. 50–51.

**31.** Docket entry no. 56.

**32.** Docket entry no. 59.

## II. *Analysis and Authorities*

### A. *AEDPA Standard of Review*

■ Because petitioner filed his federal habeas corpus action after the effective date of the AEDPA, this Court's review of petitioner's claims for federal habeas corpus relief is governed by the AEDPA. *Penry v. Johnson,* 532 U.S. 782, 792, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001). Under the AEDPA standard of review, this Court cannot grant petitioner federal habeas corpus relief in this cause in connection with any claim that was adjudicated on the merits in state court proceedings, unless the adjudication of that claim either (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Williams v. Taylor,* 529 U.S. 362, 404–05, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); 28 U.S.C. § 2254(d).

■ The Supreme Court has concluded that the "contrary to" and "unreasonable application" clauses of section 2254(d)(1) have independent meanings. *Bell v. Cone,* 535 U.S. 685, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002). Under the "contrary to" clause, a federal habeas court may grant relief if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or (2) the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Mitchell v. Esparza,* 540 U.S. 12, 15–16, 124 S.Ct. 7, 157 L.Ed.2d 263 (2003)("A state court's decision is 'contrary to' our clearly established law if it 'applies a rule that contradicts the governing law set forth in our cases' or it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.'"). A state court's mere failure to cite governing Supreme Court authority does not establish that the state court's decision is "contrary to" clearly established federal law: "the state court need not even be aware of our precedents; 'so long as neither the reasoning nor the result of the state-court decisions contradicts them.'" *Id.* at 16, 124 S.Ct. 7.

■ Under the "unreasonable application" clause, a federal habeas court may grant relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case. *Wiggins v. Smith,* 539 U.S. 510, 520, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). A federal court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 520–21, 123 S.Ct. 2527. The focus of this inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and an "unreasonable" application is different from a merely incorrect one. *Id.* at 520, 123 S.Ct. 2527; *Price v. Vincent,* 538 U.S. 634, 641, 123 S.Ct. 1848, 155 L.Ed.2d 877 (2003)("[I]t is the habeas applicant's burden to show that the state court applied [that case] to the facts of his case in an objectively unreasonable manner."). Legal principles are "clearly established" for purposes of AEDPA review when the holdings, as opposed to the dicta, of Supreme Court decisions as of the time of the relevant state-court decision establish those principles. *Yarborough v. Alvarado,* 541 U.S. 652, 124 S.Ct. 2140, 2147, 158 L.Ed.2d 938 (2004)("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'").

■ The AEDPA also significantly restricts the scope of federal habeas review of state court fact findings, requiring that a petitioner challenging state court fact findings establish by clear and convincing evidence that the state court's findings were erroneous. *See Miller v. Johnson,* 200 F.3d 274, 281 (5th Cir.2000) (holding state court fact findings are presumed correct and the petitioner has the burden of rebutting the presumption by clear and convincing evidence); *Hicks v. Johnson,* 186 F.3d 634, 637 (5th Cir.1999) (holding the AEDPA requires federal habeas courts to accept as correct state court factual determinations unless the petitioner rebuts them by clear and convincing evidence); *Hernandez v. Johnson,* 108 F.3d 554, 558 & n. 4 (5th Cir.1997) (holding that under the AEDPA, the proper forum for the making of all factual determinations in habeas cases will shift to the state courts "where it belongs" and recognizing that the AEDPA clearly places the burden on the federal habeas petitioner "to raise and litigate as fully as possible his potential federal claims in state court"); 28 U.S.C. § 2254(e)(1).

### B. *Atkins v. Virginia /Mental Retardation Claim*

#### 1. *The Claim*

■ Petitioner's initial claim for relief in his second amended petition argues that his execution would violate the principle the Supreme Court announced in *Atkins v. Virginia* because petitioner is mentally retarded.[33]

#### 2. *Clearly Established Federal Law*

The Supreme Court's Eighth Amendment analysis in *Atkins* focused initially on current trends among state legislatures regarding the imposition of the death sentence on mentally retarded murderers. *See Atkins,* 536 U.S. at 311–17, 122 S.Ct. 2242 (holding that the Eighth Amendment draws its meaning from the evolving standards of decency that mark the progress of a maturing society and that the clearest and most reliable objective evidence of contemporary values is the legislation enacted by state legislatures). The Court then shifted its focus to the dual penological purposes served by the death penalty: retribution and deterrence of capital crimes by prospective offenders. *Id.* at 318–21, 122 S.Ct. 2242. With regard to retribution, the Court held that an exclusion from the death penalty for mentally retarded murderers, who have lesser culpability than the average murderer, was warranted given its prior conclusion that the culpability of the average murderer does not merit the death sentence. *Id.* at 319, 122 S.Ct. 2242. The Court then held, in pertinent part, as follows:

> With respect to deterrence—the interest in preventing capital crimes by prospective offenders—"it seems likely that 'capital punishment can serve as a deterrent only when murder is the result of premeditation and deliberation.'" Exempting the mentally retarded from that punishment will not affect the "cold calculus that precedes the decision" of other potential murderers. Indeed, that sort of calculus is at the opposite end of the spectrum from behavior of mentally

---

**33.** Petitioner's Second Amended Petition, docket entry no. 44, filed May 14, 2004 (henceforth "Second Amended Petition"), at pp. 35–55. The bulk of Petitioner's Reply to respondent's Motion for Summary Judgment also focuses on petitioner's *Atkins* claim. *See* Petitioner's Reply to Dretke's Answer to Mor-

eno's Second Amended Petition, docket entry no. 56, filed January 14, 2005 (henceforth "Petitioner's Reply"), at pp. 2–21; and Petitioner's Amended Reply, docket entry no. 59, filed February 8, 2005 (henceforth "Amended Reply"), at pp. 2–26.

retarded offenders. The theory of deterrence in capital sentencing is predicated upon the notion that the increased severity of the punishment will inhibit criminal actors from carrying out murderous conduct. Yet it is the same cognitive and behavioral impairments that make these defendants less morally culpable—for example, the diminished ability to understand and process information, to learn from experience, to engage in logical reasoning, or to control impulses—that also make it less likely that they can process the information of the possibility of execution as a penalty and, as a result, control their conduct based upon that information.

*Id.* at 319–20, 122 S.Ct. 2242 (citations omitted). The Supreme Court ultimately concluded that execution of mentally retarded criminals would not measurably advance the deterrent or retributive purposes underlying the death penalty and, therefore, the Eighth Amendment prohibits such punishment. *Id.* at 321, 122 S.Ct. 2242.

### 3. *State Court Disposition*

Petitioner fairly presented his *Atkins* claim to the state courts in his second state habeas corpus proceeding. In support of his claim to be mentally retarded, however, petitioner presented the state habeas court with only a report dated June 13, 2003 of a psychological evaluation performed on petitioner that concluded that (1) petitioner had a full scale score of 64 [34] on an IQ evaluation; (2) this score might not be valid and may "somewhat underestimate his true level of intellectual func-

tioning" because petitioner appeared to be poorly motivated and may have exaggerated his deficits; (3) he was a poor personal historian, refusing to furnish any information regarding his offense, and indicating that he received some special education services while in school but failing to furnish any details regarding the specific classes he attended; (4) his motor behavior, level of responsiveness, facial expressions, eye contact, and affect were all within normal limits; (5) his speech was free of articulation errors and he expressed himself appropriately with adequate command of language; (6) his cognitive processing speed was unremarkable; (7) he was oriented to time, place, person, and situation; (8) he displayed no deficits in remote, recent, or intermediate memory; (9) he appeared to have no difficulty concentrating or maintaining a cognitive set; (10) he displayed no indication of organic brain impairment; and (11) he completed only the eighth grade but later earned his GED. [35]

In its Order dismissing petitioner's second state habeas corpus application as an abuse of the writ, the Texas Court of Criminal Appeals held that, to avoid the barrier imposed by state writ-abuse principles, a successive state habeas corpus application asserting an *Atkins* claim must do more than make a naked assertion of mental retardation; it must allege sufficient specific facts to establish a *prima facie* case supporting such a claim. *Ex parte Jose Angel Moreno*, No. 25,897–02 (Tex.Crim.App. September 10, 2003) at 3–4. The Court of Criminal Appeals went on

---

**34.** An IQ between 70 and 75 or lower is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition. *Atkins*, 536 U.S. at 309 n. 5, 122 S.Ct. 2242.

**35.** The full, four-page report prepared by licensed psychological associate Gordon Potter is the final attachment to petitioner's second state habeas corpus application, which was filed in state court on June 20, 2003, and appears among the state court record relating to petitioner's second state habeas corpus proceeding transmitted to this Court by respondent on June 16, 2004.

to explain that such a *prima facie* case may be satisfied through either (1) evidence of at least one IQ test before age 18 from which a reasonable trier of fact could conclude the applicant is mentally retarded under the definitions identified in *Atkins* [36] coupled with supporting affidavits from qualified experts or laymen possessing personal knowledge that raise an issue as to the applicant's lack of adaptive skills and then onset of mental retardation before age 18 or (2) "other materials supporting a conclusion of 'significant subaverage intellectual functioning.'" *Id.* at 4 & n. 3.

The Texas Court of Criminal Appeals noted (1) the absence of any fact-specific allegations, much less any evidence, regarding previous IQ testing performed on petitioner, (2) the fact that one of petitioner's former employers had testified at trial that petitioner was "very intelligent, super intelligent," (3) the concerns expressed by the expert who tested petitioner that petitioner's low IQ test score might have been more symptomatic of intentional malingering rather than indicative of true intellectual deficit, and (4) the absence of any allegations or evidence establishing that petitioner suffered from any limitations in adaptive skill areas or adaptive functioning

prior to age 18. *Id.* at 4–6. Based on those considerations, the Court of Criminal Appeals concluded that petitioner had failed to allege specific facts establishing a *prima facie* case in support of an *Atkins* claim, and dismissed petitioner's second state habeas corpus application as an abuse of the writ. *Id.* at 5–6.

#### 4. AEDPA Review

 While purporting to dispose of petitioner's *Atkins* claim strictly on state procedural grounds, the Court of Criminal Appeals' Order dismissing petitioner's second state habeas corpus application as an abuse of the writ clearly demonstrates that court made an adjudication "on the merits" of petitioner's *Atkins* claim for purposes of the AEDPA's deferential standard of review. Ordinarily, a ruling that a party has failed to establish a *prima facie* case in support of its claim is considered a ruling "on the merits." *See, e.g., Young v. City of Houston,* 906 F.2d 177, 180 (5th Cir.1990)(recognizing that dismissal of a claim for failure to present a *prima facie* case was an adjudication on the merits); *Lewis v. Brown & Root,* 711 F.2d 1287, 1290 n. 3 (5th Cir.1983)(recognizing that dismissal for failure to state a *prima facie* case is a dismissal on the merits). "In the

---

**36.** The Supreme Court's opinion in *Atkins* specifically identified two clinical definitions of mental retardation:

The American Association on Mental Retardation (AAMR) defines mental retardation as follows: *"Mental retardation refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18."* The American Psychiatric Association's definition is similar: "The essential feature

of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system." *Atkins v. Virginia,* 536 U.S. at 308 n. 3, 122 S.Ct. 2242 (citations omitted).

context of federal habeas corpus proceedings, adjudication 'on the merits' is a term of art that refers to whether a court's disposition of the case was substantive as opposed to procedural." *Neal v. Puckett*, 286 F.3d 230, 235 (5th Cir.2002)(*en banc* ), *cert. denied*, 537 U.S. 1104, 123 S.Ct. 963, 154 L.Ed.2d 772 (2003). "In making that determination, we consider three factors: '(1) what the state courts have done in similar cases; (2) whether the history of the case suggests that the state court was aware of any ground for not adjudicating the case on the merits; and (3) whether the state courts' opinions suggest reliance upon procedural grounds rather than a determination on the merits.' " *Henderson v. Cockrell*, 333 F.3d 592, 598 (5th Cir.2003). The Court of Criminal Appeals' resolution of petitioner's *Atkins* claim was clearly a ruling on the merits of that claim, was an integral part of that court's "abuse of the writ" analysis, and may not be rationally characterized as a procedural ruling.

Thus, the question before this Court is whether the Court of Criminal Appeals' summary rejection on the merits of petitioner's *Atkins* claim resulted from either (1) an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States, or (2) an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Williams*, 529 U.S. at 404–05, 120 S.Ct. 1495.

■ As the Supreme Court noted in *Atkins*, "[n]ot all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus." *Atkins*, 536 U.S. at 317, 122 S.Ct. 2242. Moreover, the Supreme Court went on to point out in *Atkins* that the

clinical definitions of mental retardation "require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction *that become manifest before age 18.*" *Id.* at 318, 122 S.Ct. 2242 (emphasis added). Thus, it is clearly established under Supreme Court precedent that an *Atkins* claim must be supported by a showing that the defendant suffered "significant limitations in adaptive skills" before age 18.

The Texas Court of Criminal Appeals reasonably determined from the evidence before it that petitioner had presented no fact-specific allegations, much less any evidence, showing that petitioner had ever tested as mentally retarded on any IQ test prior to reaching age 18. Likewise, that court also reasonably determined from the evidence before it that there were no fact-specific allegations, much less any evidence, establishing that petitioner suffered from any significant limitations in adaptive skills. Petitioner's conclusory assertions that he received unspecified "special education services," had little substantial work experience, and had a long history of drug and alcohol abuse do not even begin to satisfy the standard for establishing that petitioner suffered from "significant limitations in adaptive skills" before age 18.

As the Court of Criminal Appeals pointed out, one of petitioner's former employers testified at trial that petitioner was "super intelligent" and illustrated this point with an anecdote about petitioner's ability to repair a complex copier using only a paper clip.[37] Likewise, petitioner's former baby-sitter and life-long friend testified at trial that petitioner was "very smart." [38] Petitioner told his psychological interviewer in 2003 that he had successfully earned a GED. Petitioner presented the state habeas court with no educational,

---

**37.** S.F. Trial, Volume XXVIII, testimony of James Sickafus, at pp. 5865–66.

**38.** S.F. Trial, Volume XIX, testimony of Virginia Resendez, at p. 5935.

medical, or psychological records casting any doubt on petitioner's intellectual ability prior to age 18. Nor did petitioner present the state habeas court with any affidavits from any person who knew petitioner prior to age 18 that cast any doubt on petitioner's intellectual functioning or ability to engage in adaptive skills.

Finally, the circumstances of petitioner's crime belie any assertion that petitioner suffered from any deficit in intellectual ability or adaptive skills. Petitioner admitted that he carefully planned and executed a complex scheme in which he (1) convinced two unsuspecting friends to help him dig Cruz's grave, (2) obtained a difficult-to-find Central Catholic High School directory to help him identify his prey, (3) plotted Cruz's route home from work and repeatedly used large rocks to block Cruz's vehicle's entry into his neighborhood, (4) handcuffed and blind-folded Cruz at gunpoint before driving Cruz to the isolated location where Cruz's shallow grave awaited him, (5) executed Cruz and buried his body after removing Cruz's handcuffs, (6) left Cruz's vehicle at a location where he had previously stashed another vehicle, (8) made his ransom demands, but (9) when he drove past Cruz's residence and observed an unmarked police vehicle parked there, abandoned further efforts to contact Cruz's family or to obtain the ransom. In short, petitioner displayed precisely the sort of "cold calculus that precedes the decision" the Supreme Court held in *Atkins* to be "at the opposite end of the spectrum from [the] behavior of mentally retarded offenders." *Atkins*, 536 U.S. at 319–20, 122 S.Ct. 2242.

If there were any doubt regarding petitioner's capabilities, his near-escape from the Bexar County Adult Detention Center in April 1986, his successful efforts to disable his cell door, and his repeatedly successful efforts to remove his handcuffs and to conceal homemade lock picks from law enforcement officers who search him, all of which were detailed during the punishment phase of his trial, support the Court of Criminal Appeals' determination that petitioner failed to make a *prima facie* showing that he is mentally retarded.

Given the limited nature of the allegations petitioner presented to the Court of Criminal Appeals in his second state habeas corpus proceeding and the ample evidence of petitioner's demonstrated capabilities to engage in the planning and execution of complex schemes contained in the record from both phases of petitioner's trial, that court's rejection on the merits of petitioner's *Atkins* claim was neither an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States, nor an unreasonable determination of the facts in light of the evidence presented in petitioner's second state habeas proceeding.

In fact, the legal standard applied by the Court of Criminal Appeals to reject petitioner's *Atkins* claim was virtually identical to the standard employed by the Fifth Circuit to evaluate similar requests for permission to file successive federal habeas corpus petitions asserting *Atkins* claims made to that court. *See In re Morris*, 328 F.3d 739, 740 (5th Cir.2003)(holding that a *prima facie* case sufficient to warrant permission to file a successive federal habeas petition asserting an *Atkins* claim includes a showing that the petitioner "should be categorized as 'mentally retarded'" as defined in *Atkins* ); *In re Hearn*, 376 F.3d 447, 455 (5th Cir.2004)(holding that a prisoner's motion for counsel to investigate and prepare a successive *Atkins* claim required a "colorable showing of mental retardation" that was satisfied by (1) school records showing the petitioner failed first grade, despite regular attendance, and scored in the mild mentally retarded range in an IQ test administered during his

school years, and (2) trial testimony from a family member demonstrating the petitioner's "compromised social skills"). Simply put, petitioner failed to allege any specific facts sufficient to make a colorable showing of mental retardation.

### 5. *De Novo Review*

 The Fifth Circuit has held that when it is not clear whether a claim has been adjudicated on the merits in state court, the AEDPA's deferential standard of review does not apply. *See, e.g., Solis v. Cockrell,* 342 F.3d 392, 394 n. 2 (5th Cir. 2003); *Henderson,* 333 F.3d at 598. Therefore, out of an abundance of caution, this Court will undertake a true *de novo* review of petitioner's *Atkins* claim. In the event that the Court of Criminal Appeals' rejection of petitioner's *Atkins* claim is not entitled to deference under the AEDPA, for the reasons set forth in Section II.B.4. above, petitioner is still not entitled to federal habeas corpus relief herein. Petitioner has failed to allege any specific facts, much less furnish any evidence, establishing that he is, in fact, "mentally retarded" within the meaning of that term as utilized in *Atkins.* The Supreme Court made clear in *Atkins* that such a showing requires more than a low IQ score. Petitioner has alleged no specific facts showing that he ever suffered from any significant limitations on his ability to engage in adaptive skills prior to age 18. On the

contrary, petitioner's confession and the evidence corroborating it introduced at his trial evidence a degree of cold, calculating behavior on his part that lies "at the opposite end of the spectrum from the behavior of mentally retarded offenders." *Atkins,* 536 U.S. at 319–20, 122 S.Ct. 2242. Petitioner's *Atkins* claim lacks even arguable merit even when examined under a *de novo* standard of review.

### C. *Fourth Amendment Claim*

#### 1. *The Claim*

Petitioner's third claim in his second amended petition complains that the state trial court erroneously denied his motions to suppress his confession and the murder weapon.[39]

#### 2. *State Court Disposition*

 On direct appeal, petitioner argued in three related points of error that the state trial court had erroneously denied his motions to suppress because the affidavit used to secure the search and arrest warrant executed on February 7, 1986 did not support the magistrate's finding of probable cause for the arrest and search.[40] The Texas Court of Criminal Appeals held that (1) petitioner fought the admission of the affidavit in question during his *Jackson v. Denno* hearing and petitioner failed to secure a ruling *on the record* regarding the admission of the affidavit from the state trial court,[41] (2) peti-

---

**39.** Second Amended Petition, at pp. 56–88 & 101–24; Petitioner's Reply, at pp. 22–24 & 34–37; Amended Reply, at pp. 28–31 & 40–43.

**40.** These arguments were set forth in petitioner's fifth, sixth, and seventh points of error on direct appeal and are found at pages 14–20 of Appellant's Brief included among the state court records relating to petitioner's direct appeal.

**41.** During petitioner's *Jackson v. Denno* hearing, petitioner's trial counsel objected to the

admission of the search/arrest warrant affidavit when the prosecution offered it *for purposes of that hearing* and succeeded in convincing the state trial court to withhold any ruling on the admissibility of the affidavit until some unspecified future date. S.F. Trial, Volume IV, at pp. 516–17. There is nothing further in the record from petitioner's pretrial, trial, or post-trial proceedings now before this Court establishing that the state trial court ever subsequently made a ruling *on the record* regarding the admission of the search/arrest warrant affidavit. While hardly conclusive, the court reporter's index accom-

tioner thereby failed to carry his burden of ensuring the affidavit was part of the appellate record, and (3) petitioner thereby procedurally defaulted on his complaints about the denial of his motions to suppress. *Moreno,* 858 S.W.2d at 461–62.

### 3. *Stone v. Powell Preclusion*

Respondent correctly argues that federal habeas review of petitioner's Fourth Amendment claim is precluded by the Supreme Court's holding in *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). In *Stone,* the Supreme Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Id.* at 494, 96 S.Ct. 3037. The Fifth Circuit has consistently adhered to the holding in *Stone v. Powell. See, e.g., Busby v. Dretke,* 359 F.3d 708, 722 (5th Cir.2004) (holding a state prisoner's Fourth Amendment claims are not cognizable in a federal habeas corpus proceeding); *Jones v. Johnson,* 171 F.3d 270, 278 (5th Cir.1999) (same).

Petitioner argues that he was denied a "full and fair opportunity" to litigate his Fourth Amendment claim in the Texas Court of Criminal Appeals by virtue of that court's reliance on state procedural default principles to summarily dismiss petitioner's three points of error raising that claim. However, the Fifth Circuit has rejected similar arguments *See United States v. Ishmael,* 343 F.3d 741, 742 (5th Cir.2003) (holding that a subsequent change in the law by the Supreme Court that arguably overruled the Fifth Circuit's prior rejection of a federal prisoner's Fourth Amendment claim did not render the prisoner's prior proceedings any less "full and fair" for purposes of *Stone* ); *Janecka v. Cockrell,* 301 F.3d 316, 320–21 (5th Cir.2002) (holding that *Stone* preclusion requires only that the defendant was afforded a full and fair *opportunity* to litigate his Fourth Amendment claim in the state trial and appellate courts and that neither the defendant's failure to take advantage of that opportunity nor even a mistake by the state appellate court in its ruling on the Fourth Amendment claim renders *Stone* inapplicable).

Petitioner had a full and fair *opportunity* to litigate his Fourth Amendment claim during his pretrial *Jackson v. Denno* hearing and did so. Petitioner likewise had a

---

panying the Statement of Facts from petitioner's pretrial and trial proceedings, contained in the front of S.F. Trial, Volume II, accurately reflects the pages of the record on which the arrest/search warrant affidavit were identified and offered but includes no indication that document was ever admitted, even for purposes of the motion to suppress hearing.

Petitioner argues in this Court that a number of comments made by his trial counsel during the oral arguments held August 5, 1986 on petitioner's motions to suppress and the trial court's cryptic replies thereto suggest the state trial court had previously admitted the search/arrest warrant affidavit for purposes of the *Jackson v. Denno* proceeding. More specifically, petitioner cites three statements petitioner's trial counsel made indicating that he believed the trial court had admit-

ted the search warrant and the affidavit in support thereof for purposes of the suppression hearing. *See* S.F. Hearing on Pretrial Motions held August 5, 1986, at pp. 3–4 & 9–10. After the last two of these comments, the state trial court responded simply "Yes" and "Right," respectively. *Id.* Having independently reviewed the exchanges in question, this Court finds nothing therein that clearly establishes the state trial court acknowledged that it was then making, or had previously made, a ruling on the search/arrest warrant affidavit's admissibility. On the contrary, prior to all three of the comments made by petitioner's trial counsel, both parties rested and closed without any further effort to admit the affidavit in question *on the record. Id.* at 3.

full and fair *opportunity* to litigate his Fourth Amendment claim on direct appeal. That his trial or appellate counsel, or both, may have failed to take the steps necessary to properly preserve that claim for state appellate review does not render the *Stone* bar inapplicable. *Id.*

### 4. *Procedural Default*

 Insofar as respondent argues that the Texas Court of Criminal Appeals' determination of state procedural default bars federal habeas review of petitioner's Fourth Amendment claim, independent of the *Stone* rule,[42] respondent is also correct. Procedural default exists where (1) a state court clearly and expressly bases its dismissal of a claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal, or (2) the petitioner fails to exhaust all available state remedies, and the state court to which he would be required to petition would now find the claims procedurally barred. *Coleman v. Thompson,* 501 U.S. 722, 735 n. 1, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). In either instance, the petitioner is deemed to have forfeited his federal habeas claim. *O'Sullivan v. Boerckel,* 526 U.S. 838, 848, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999). However, such procedural defaults only bar federal habeas review when the state procedural rule that forms the basis for the procedural default was "firmly established and regularly followed" by the time it was applied to preclude state judicial review of the merits of a federal constitutional claim. *Ford v.*

*Georgia,* 498 U.S. 411, 424, 111 S.Ct. 850, 112 L.Ed.2d 935, (1991); *Busby,* 359 F.3d at 718.

When it disposed of petitioner's Fourth Amendment claim based on state procedural default principles, the Texas Court of Criminal Appeals expressly relied on a long line of opinions holding that a defendant who wishes to contest the validity of a search or arrest warrant and the supporting affidavit that has been presented to the state trial court for evaluation must see that the warrant and affidavit are included in the appellate record. *See More-no v. State,* 858 S.W.2d at 461, *citing Miller v. State,* 736 S.W.2d 643, 647–48 (Tex. Crim.App.1987), *in turn citing Rumsey v. State,* 675 S.W.2d 517, 519–20 (Tex.Crim. App.1984)("the burden is on the defendant to include a contested affidavit supporting an arrest warrant in the record"), *in turn citing Dusek v. State,* 467 S.W.2d 270, 272 (Tex.Crim.App.1971)("If the appellant desired to attack the legality of his arrest and subsequent search upon that basis, it was incumbent upon him to see that the affidavits were properly in the appellate record."). Thus, the state procedural rule that led to the summary dismissal of petitioner's Fourth Amendment claim on direct appeal was firmly established and regularly applied long before the date of petitioner's *Jackson v. Denno* hearing.[43] Petitioner's procedural default bars federal habeas review of his Fourth Amendment claim.

---

**42.** Respondent's Motion for Summary Judgment at 29.

**43.** Insofar as petitioner argues that he effectively complied with the state procedural rule, *see* Second Amended Petition at 124, it is not within the province of this Court to review or overrule a state court's application of its own principles of procedural default in a federal habeas corpus proceeding. Federal habeas corpus relief will not issue to correct errors of

state constitutional, statutory, or procedural law, unless a federal issue is also presented. *Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). This Court does not review a state prisoner's federal habeas corpus petition to determine whether the state appellate courts correctly construed and applied state law; federal habeas corpus relief does not lie for errors of state law. *Id.*

### 5. De Novo Merits Review

Nevertheless, because petitioner's Fourth Amendment claim furnishes the foundation for petitioner's first assertion of ineffective assistance by his appellate counsel, this Court must examine the merits, or lack thereof, of this claim.

#### a. "Totality of the Circumstances" is the Test

Insofar as petitioner premises his Fourth Amendment claim on the two-pronged test derived from the Supreme Court's holdings in *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), and *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), that reliance is misplaced. The Supreme Court expressly rejected the *Aguilar–Spinelli* approach to probable cause determinations in *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)("[W]e conclude that it is wiser to abandon the 'two-pronged' test established by our decisions in *Aguilar* and *Spinelli.* In its place we reaffirm the totality of the circumstances analysis that traditionally has informed probable cause determinations.").

#### b. Good–Faith Exception to Exclusionary Rule

 Moreover, because the arrest and search were executed pursuant to a facially valid warrant in petitioner's case, the appropriate federal constitutional standard for evaluating petitioner's challenge to the legality of his arrest and the search of his residence on February 7, 1986 is set forth in the Supreme Court's opinion in *United States v. Leon,* 468 U.S. 897, 918–20, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984)(holding that evidence obtained by an officer acting with objective good faith who has obtained a search warrant from a magistrate and acted within its scope will not be suppressed even if the warrant is subsequently determined to be deficient). This "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Id.* at 922 n. 23, 104 S.Ct. 3405. Under this standard, suppression is ordinarily appropriate in only four situations: (1) where the issuing judicial officer was misled by information in an affidavit that the affiant knew was false or would have known was false but for his reckless disregard of the truth; (2) where the issuing judicial officer wholly abandoned his judicial role; (3) the warrant is based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) where the warrant is so facially deficient, i.e., failing to particularize the place to be searched or the things to be seized, that the executing officers cannot reasonably presume it to be valid. *Id.* at 923, 104 S.Ct. 3405.

#### c. Applying the Good–Faith Exception

The Fifth Circuit employs a two-step approach to rulings on motions to suppress where a search warrant is involved, inquiring first whether the good-faith exception of *Leon* outlined above applies; and, if it does, the Fourth Amendment inquiry ends. *See, e.g., United States v. Froman,* 355 F.3d 882, 888 (5th Cir.2004); *United States v. Hinojosa,* 349 F.3d 200, 203 (5th Cir. 2003).

 The primary focus of the testimony during petitioner's *Jackson v. Denno* hearing was on the circumstances surrounding the creation and execution of petitioner's written confession. Nevertheless, other testimony from that same hearing furnishes a plethora of evidence establishing the good faith of the law enforcement officers who executed the petitioner's arrest and search warrant on February 7, 1986, as well as the officer

who executed the affidavit used to secure that warrant.

More specifically, San Antonio Police Officer Salvador A. Gonzales testified at petitioner's *Jackson v. Denno* hearing that (1) while investigating a series of burglaries unrelated to the Cruz murder, on February 3, 1986, he was informed by a pair of confidential informants that Jose Angel Moreno had possession of a handgun, (2) while neither of the two confidential informants had ever before furnished Gonzales with information relating to any criminal activity, Gonzales had personally known one of the informants for over fifteen years and knew him to be a reliable and credible person, (3) Gonzales had known the other confidential informant for only a few months but knew him to be a relative of the other informant and likewise reliable, (4) both the confidential informants were "respected people in the community," (5) two days later, on February 5, 1986, the confidential informants reported to Gonzales that the weapon in petitioner's possession was a .44 caliber handgun, (6) later that date, Gonzales contacted Bexar County Deputy Sheriff Salvador Marin, the law enforcement officer heading the Cruz murder investigation, and learned from Marin that a Bexar County ballistics expert had determined the weapon used to murder Cruz was a .44 Charter Arms Bulldog revolver, (7) the ballistics expert's conclusion regarding the caliber of the Cruz murder weapon was not public knowledge at that time, (8) on February 6, 1986, the confidential informants reported to Gonzales that, the day before, they had personally observed petitioner carrying a .44 caliber Charter Arms Bulldog revolver in his waistband and storing the gun between the mattress and box springs of petitioner's bed at his residence at 133 Sexauer,

(9) that same date, the confidential informants also furnished Gonzales with the serial number of the handgun in question, (10) later on February 6, 1986, Gonzales transmitted the foregoing information to both Deputy Marin and San Antonio Police Homicide Lieutenant Jack Summey, (11) on February 7, 1986, Gonzales obtained a copy of the audiotape recording of the ransom demand telephone call recorded at Cruz's residence on January 22, 1986 from Lt. Summey, (12) that same date, Gonzales played the tape recording for his confidential informants and both of them identified the voice making the ransom demand on the recording as petitioner's, and (13) Gonzales immediately communicated his confidential informants' identifications of petitioner's voice to Lt. Summey.[44]

Bexar County Sheriff's Investigator Salvador Marin testified at petitioner's *Jackson v. Denno* hearing that (1) all of the information regarding the statements of a confidential informant referenced in his search/arrest warrant affidavit came to him either directly from Officer Gonzales or from Officer Gonzales through Lt. Summey, (2) he had no personal knowledge regarding the identity of the confidential informant until May 3, 1986, (3) on February 5, 1986, Officer Gonzales called him to inquire as to the caliber of the weapon used in the Cruz murder, (4) he informed Gonzales that the ballistics expert had identified the murder weapon as a .44 caliber Charter Arms Bulldog revolver, (5) Marin had obtained this information directly from Bexar County ballistics expert Richard Stengel and, as of that date, this information had been communicated only among the law enforcement officers investigating the Cruz murder, (6) Gonzales reported to Marin that his confidential in-

---

**44.** S.F. Trial, Volume IV, testimony of Salvador A. Gonzales at pp. 417–23, 437–46, and 458–68.

formant had informed Gonzales the petitioner was in possession of a .44 caliber handgun and ammunition, which the confidential informant had personally observed at petitioner's residence, (7) Gonzales gave Marin petitioner's name, age, and address, (8) this was the first time petitioner's name had come up in the investigation of the Cruz kidnaping and murder, (9) on February 6, 1986, Gonzales reported further to Marin that Gonzales' confidential informant had informed Gonzales that the serial number of petitioner's handgun was 308496, he had observed petitioner carrying the weapon in his waistband and storing it between a mattress and box springs at petitioner's residence at 133 Sexauer, and two of petitioner's close friends, named Armando and Celestino, had disappeared from the neighborhood, (10) while Marin was not present when Gonzales played the ransom-demand tape recording for the confidential informant, Gonzales told Marin on February 7, 1986 that the confidential informant had listened to the tape and identified petitioner's voice, (11) on February 7, 1986, Gonzales reported to Marin that his confidential informant did not have a criminal record, had never been in trouble with the law, and was gainfully employed in San Antonio, (12) Gonzales also told Marin that he had personally known the informant his whole life and knew the informant to be credible and reliable, (13) nonetheless, Marin directed Gonzales to re-check the informant's arrest record, and (14) thereupon, Gonzales walked across the room, checked the confidential informant's criminal background on a computer in Marin's presence, and reported once again that the confidential informant had no arrest record.[45]

At the time Deputy Marin applied for a warrant for petitioner's arrest and to search petitioner's residence at 133 Sexauer for a .44 caliber Charter Arms Bulldog revolver, Deputy Marin had information, albeit hearsay information, in his possession that established that (1) a confidential informant had related to Officer Gonzales highly fact-specific information that, on February 5, 1986, the informant had personally seen a .44 caliber handgun, with a specific serial number, matching the make and model of the murder weapon used in the Cruz case, in a precise location within petitioner's residence, (2) Gonzales had known the confidential informant for many years and believed the informant to be credible and reliable, (3) the informant had no criminal record and was an established, respected, gainfully employed member of the community, and (4) Gonzales's informant had also listened to the tape recording of the ransom de-

---

**45.** S.F. Trial, Volume IV, testimony of Salvador Marin at pp. 473–77; Volume V, testimony of Salvador Marin at pp. 565–69, 571–74, 578–80, 585–607, 654–62, 665–75, 679–89, 693–99, and 701–07.

While Officer Gonzales' testimony at petitioner's *Jackson v. Denno* hearing made clear that he was dealing at all times with two confidential informants, Deputy Marin's testimony at that same hearing was, for the most part, couched in terms of a single "informant." *Id.,* Volume IV at pp. 473–77; Volume V at pp. 569–73, 578–80, 585–86, 588–89, 603–07, 655–62, 666–72, 681–87, 689, 695–99, 703, 706, and 709–10. The confusion is compounded by virtue of the fact that, at one point in his testimony at the *Jackson v.*

*Denno* hearing, Deputy Marin referred to Officer Gonzales as his "confidential informant." *Id.,* Volume V at pp. 656–57. For unknown reasons, possibly because Deputy Marin's contemporaneously-prepared written investigative reports also consistently referred to a single "informant," petitioner's trial counsel never confronted Deputy Marin with this apparent discrepancy. *Id.,* Volume V at pp. 693–99, 701–07. In fact, having independently reviewed both the entire record from both the *Jackson v. Denno* hearing and trial on the merits, it is unclear to this Court whether, prior to executing the search/arrest warrant affidavit, Deputy Marin knew Officer Gonzales had been dealing with multiple informants, as opposed to a single person.

mand telephone call and had identified petitioner's voice as the one demanding a ransom for Cruz's release on that recording.[46]

Petitioner has failed to identify any information furnished by either of Officer Gonzales's confidential informants that proved to be factually erroneous. On the contrary, the search of petitioner's residence on February 7, 1986 revealed that the .44 caliber Charter Arms Bulldog revolver identified by Officer Gonzales's confidential informants was in the precise location the informants had advised Officer Gonzales they had seen it. The confidential informants also furnished law enforcement officers with a serial number for that handgun that later proved to be accurate.[47] Likewise, petitioner's written confession and the testimony at petitioner's trial established beyond any doubt that petitioner's voice was the one recorded by the San Antonio Police Department just after noon on January 22, 1986 making a telephonic demand for ransom in exchange for Cruz's release and warning "you killed him."

Petitioner argues that several statements contained in Marin's arrest/search warrant affidavit were either false or made with reckless disregard for the truth, thus depriving the State of the benefits of the good-faith exception to the Fourth Amendment's exclusionary rule.[48] Petitioner's hypercritical reading of Marin's affidavit ignores the unassailable fact that all the information furnished to law enforcement officers by Officer Gonzales's confidential informant(s) reflected in Marin's affidavit proved to be fully accurate. Petitioner's other complaints about the accuracy of Marin's affidavit suffer from this same fundamental defect. For instance, petitioner complains that Marin's affidavit erroneously identifies himself as the law enforce-

**46.** Deputy Marin's affidavit appears among the state court records relating to petitioner's first state habeas corpus proceeding as Exhibit B to petitioner's first state habeas corpus application. *See* State Habeas Transcript at pp. 80–81. Because of its length, the affidavit will not be reproduced herein. It will suffice to note that the affidavit contained highly detailed allegations regarding (1) the circumstances surrounding the discovery of Cruz's body, (2) the ballistic's expert's findings regarding the type of weapon used to murder Cruz, and (3) all of the information conveyed to law enforcement officers by Officer Gonzales's confidential informants. In sum, Deputy Marin's affidavit was as far from a "bare bones" affidavit as is imaginable.

**47.** Deputy Marin testified at the *Jackson v. Denno* hearing that, on February 6, 1986, he received from Officer Gonzales information that Gonzales's confidential informant had told Gonzales the serial number of petitioner's .44 caliber handgun was 308496. S.F. Trial, Volume V, testimony of Salvador Marin at p. 579. At trial, prosecution expert Richard Stengel testified that State's exhibit no. 9, i.e., the .44 caliber handgun seized from petitioner's residence on February 7, 1986, bore serial number 308496. S.F. Trial, Volume

XXIII, testimony of Richard Stengel at p. 4833.

**48.** More specifically, petitioner argues that Marin's affidavit was erroneous in that (1) it purported to represent several facts as within Marin's personal knowledge when, in fact, Marin's only knowledge of that information came through hearsay statements made by the confidential informant related to Marin by Officer Gonzales, (2) it misrepresented that a single confidential informant had furnished the information in question to Gonzales when, in fact, two such persons had done so; (3) contrary to the plain language of the affidavit, the affiant had no personal knowledge that either of the confidential informants had identified the voice on the ransom-demand tape recording as petitioner's; (4) contrary to the plain language of the affidavit, the affiant had not personally checked the criminal background of either confidential informant; (5) the affiant's representation that the firearms expert had identified the weapon that fired the bullet retrieved at autopsy from Cruz's body as a Charter Arms Bulldog revolver was false; (6) the affiant's assertion that petitioner was "in charge" of the residence and vehicle identified in the affidavit was false.

ment officer to whom the confidential informant(s) identified petitioner's voice as that of the ransom-demanding caller recorded by police.[49] However, the identity of the law enforcement officer to whom the informant(s) made that identification was irrelevant to the issue of whether probable cause existed to believe petitioner was involved in Cruz's kidnaping and murder. More importantly, petitioner presents no allegation, much less any evidence, showing that the informant's identification of petitioner's voice was inaccurate. Likewise, petitioner complains that Marin's affidavit identifies himself as the law enforcement officer who checked Bexar County records to ascertain that the confidential informant had never been arrested.[50] However, petitioner does not allege any facts, much less furnish any evidence, suggesting that either of Officer Gonzales's confidential informants had been arrested prior to February 7, 1986. Marin's admissions that Officer Gonzales, rather than Deputy Marin, was the law enforcement officer who dealt directly with the confidential informants did not diminish the accuracy of the information related to law enforcement officials by the informants.

Petitioner also complains that Marin's affidavit did not set forth detailed facts establishing the credibility and reliability of the confidential informant. Whatever the efficacy of such an argument under the *Aguilar–Spinelli* test for evaluating probable cause, the Supreme Court has rejected such an approach to probable cause determinations. *See Gates*, 462 U.S. at 233–34, 103 S.Ct. 2317 ("[I]f an unquestionably honest citizen comes forward with a report of criminal activity—which if fabricated would subject him to criminal liability—we have found rigorous scrutiny of the basis for his knowledge unnecessary."). Additionally, the highly fact-specific nature of the confidential informant's reports on the make, model, and location of petitioner's handgun furnish support for a probable cause finding under the totality of the circumstances standard. *Id.* at 234, 103 S.Ct. 2317 ("[E]ven if we entertain some doubt as to an informant's motives, his explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed first-hand, entitles him to greater weight than might otherwise be the case.").

The Fourth Amendment demands a "truthful showing" of probable cause. *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). However, this does not mean that every fact recited in a search or arrest warrant affidavit must be accurate, for probable cause may be founded upon hearsay, information received from informants, and information within the affiant's personal knowledge gathered hastily. *Id.* at 165, 98 S.Ct. 2674. A probable cause affidavit is "truthful" if the information put forth therein is believed or appropriately accepted by the affiant as true. *Id.*

Deputy Marin testified at petitioner's *Jackson v. Denno* hearing that he believed all the factual information contained in his

**49.** At the *Jackson v. Denno* hearing, Deputy Marin testified that he was not present when Officer Gonzales played the tape recording of the ransom demand for the confidential informant on February 7, 1986 and that he learned the informant had identified petitioner's voice on the tape from Officer Gonzales, through Lt. Summey. S.F. Trial, Volume V, testimony of Salvador Marin at pp. 588–89, 606–07, and 655–59.

**50.** At the *Jackson v. Denno* hearing, Marin testified that (1) he directed Officer Gonzales to perform this task, (2) Gonzales did so in Marin's presence, and (3) Gonzales immediately reported that the confidential informant was "clean." *Id.* at pp. 603–04, 661–62, and 683–86.

affidavit was accurate, including the statements therein reflecting information furnished by Officer Gonzales's confidential informant.[51] Having independently reviewed the record from petitioner's *Jackson v. Denno* hearing, this Court finds that Deputy Marin's belief was objectively reasonable given the information then at his disposal. Thus, Deputy Marin acted in an objectively reasonable manner for purposes of the rule in *United States v. Leon* when he relied upon the state magistrate's issuance of a warrant for petitioner's arrest and the search of 133 Sexauer for a .44 caliber Charter Arms Bulldog handgun. Petitioner's Fourth Amendment claim is, therefore, foreclosed by the good-faith rule announced in *Leon* more than two years before petitioner's trial.

### D. Ineffective Assistance by Appellate Counsel

#### 1. The Claims

In his second claim for relief in his second amended petition, petitioner argues that his appellate counsel rendered ineffective assistance by failing to (1) include the necessary elements, i.e., Deputy Marin's affidavit, in the appellate record, (2) investigate, discover, and raise in petitioner's motion for new trial complaints that the jury improperly discussed parole during its deliberations, and (3) raise a point of error challenging the erroneous definitions of the culpable mental states contained in the guilt-innocence phase jury instructions.[52]

#### 2. Clearly Established Federal Law

The constitutional standard for determining whether a criminal defendant has been denied the effective assistance of *trial* counsel, as guaranteed by the Sixth Amendment, was announced by the Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

To satisfy the first prong of *Strickland, i.e.,* to establish that his counsel's performance was constitutionally deficient, a convicted defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Wiggins v. Smith,* 539 U.S. 510, 521, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003); *Williams v. Taylor,* 529 U.S. 362, 390–91, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). In so doing, a convicted defendant must carry the burden of proof and overcome a strong presumption that the conduct of his trial counsel falls within a wide range of reasonable professional assistance. *Strickland,* 466 U.S. at 687–91, 104 S.Ct. 2052. Courts are extremely deferential in scrutinizing the performance of counsel and make every effort to eliminate the distorting ef-

---

**51.** S.F. Trial, Volume V, testimony of Salvador Marin at pp. 671–74, 679–89, 703–04, and 706–07.

**52.** Second Amended Petition at 56–101; Petitioner's Reply at 21–33; Amended Reply at 27–40. Petitioner fairly presented these same claims to the Texas Court of Criminal Appeals as his first claim for relief in his first state habeas corpus application. State Habeas Transcript at pp. 4–11.

fects of hindsight. *See Wiggins*, 539 U.S. at 523, 123 S.Ct. 2527 (holding that the proper analysis under the first prong of *Strickland* is an objective review of the reasonableness of counsel's performance under prevailing professional norms that includes a context-dependent consideration of the challenged conduct as seen from the perspective of said counsel at the time). It is strongly presumed that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052.

■■■ To satisfy the "prejudice" prong, a convicted defendant must establish a reasonable probability that, but for the objectively unreasonable misconduct of his counsel, the result of the proceeding would have been different. *Wiggins*, 539 U.S. at 534, 123 S.Ct. 2527; *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. *Id.*

The same standard applies to complaints about the performance of counsel on appeal. *See Smith v. Robbins*, 528 U.S. 259, 285, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000) (holding that a petitioner arguing ineffective assistance by his appellate counsel must establish both that (1) his appellate counsel's performance was objectively unreasonable and (2) there is a reasonable probability that, but for appellate counsel's objectively unreasonable conduct, the petitioner would have prevailed on appeal).

### 3. *AEDPA Review*
#### a. *The Standard of Review*

■■■ Petitioner correctly points out that the state habeas trial court's written Order applied the wrong federal constitutional standard in rejecting petitioner's complaints of ineffective assistance by petitioner's *appellate* counsel.[53] However, this does not, standing alone, entitle petitioner to federal habeas relief.

■■■ Under the AEDPA, the duty of this Court in a federal habeas corpus proceeding is not to evaluate or critique the state court's written opinion but, rather, to ascertain whether its ultimate disposition of a claim, *i.e.*, its "decision," constituted an unreasonable application of clearly established federal law or an unreasonable determination of the facts from the evidence then before that court. *See Pondexter v. Dretke*, 346 F.3d 142, 148 (5th Cir. 2003) (holding that the precise question before a federal habeas court in reviewing a state court's rejection on the merits of an ineffective assistance claim was whether the state court's ultimate conclusion was objectively reasonable); *Anderson v. Johnson*, 338 F.3d 382, 390 (5th Cir.2003)(holding a federal habeas court reviews only a state court's decision and not the opinion explaining that decision); *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir.2002) (en banc) (holding that a federal court is authorized by § 2254(d) to review only a state court's decision and not the written opinion explaining that decision).

Thus, in evaluating petitioner's complaints about the performance of his appellate counsel under the AEDPA, the issue

---

**53.** The state habeas trial court concluded that these claims were without merit because petitioner had failed to allege that any of the alleged deficiencies in the performance of petitioner's appellate counsel rendered petitioner's *trial* unfair or unreliable. State Habeas Transcript, at pp. 102–03. As explained above, in evaluating a claim of ineffective assistance by *appellate* counsel under the prejudice prong of *Strickland*, the proper inquiry is whether there is a reasonable probability that, but for the objectively unreasonable conduct of said counsel, the petitioner would have prevailed on appeal. *Robbins*, 528 U.S. at 285, 120 S.Ct. 746.

before this Court is whether the Texas Court of Criminal Appeals could reasonably have concluded that petitioner's complaints about his appellate counsel's performance failed to satisfy either prong of the *Strickland* analysis. *Schaetzle v. Cockrell*, 343 F.3d 440, 444 (5th Cir.2003). In making this determination, this Court must consider the underlying *Strickland* standard. *Id.*

b. *Failure to Include Affidavit*

(1) *No Deficient Performance*

■ This Court has independently reviewed the entire record from petitioner's *Jackson v. Denno* hearing, trial, post-trial hearings, and direct appeal. While the Texas Court of Criminal Appeals did dismiss petitioner's fifth, sixth, and seventh points of error on direct appeal because the appellate record did not include Deputy Marin's affidavit, this Court finds no basis for concluding that petitioner's *appellate* counsel was responsible for this procedural default. On the contrary, the Texas Court of Criminal Appeals' opinion on direct appeal identified the failure of petitioner to "secure a ruling by the trial court" on the admissibility of the contested affidavit as the reason why that document was not included in the appellate record. *Moreno*, 858 S.W.2d at 462. In so doing, the state appellate court implicitly laid the blame for this procedural default squarely at the feet of petitioner's trial counsel, not

his appellate counsel.[54] Thus, the state habeas court could reasonably have concluded that petitioner's state *appellate* counsel could not be held responsible for the absence of Marin's affidavit from the state appellate record.

(2) *No Prejudice*

■ Even assuming that the fault for petitioner's procedural default can be assigned to petitioner's *appellate* counsel, the state habeas court could reasonably have concluded that petitioner's first assertion of ineffective assistance failed to satisfy the prejudice prong of *Strickland*. For the reasons set forth at length above in Section II.C.5.c., petitioner's Fourth Amendment claim lacks even arguable merit under the federal constitutional standards applicable at the time of petitioner's direct appeal. In fact, petitioner's fifth, sixth, and seventh points of error on direct appeal were legally frivolous. The discussion of those points of error included in petitioner's appellant's brief, filed January 19, 1989, constituted little more than a thinly-veiled attempt to resurrect the two-pronged *Aguilar–Spinelli* test the Supreme Court rejected in *Illinois v. Gates*. Additionally, petitioner's appellant's brief included no mention of the United States Supreme Court's holding in *United States v. Leon*, nor made any serious effort to address the applicability of the good-faith

---

**54.** Petitioner has presented this Court with an unexhausted affidavit from petitioner's state appellate counsel, attorney James Bruner, in which Bruner purports to assume responsibility for the absence of Marin's affidavit from the state appellate record. See Affidavit of James Bruner, attached to Petitioner's Motion to Supplement the Record, filed March 8, 2002, docket entry no. 17. However, neither Bruner's affidavit nor any of petitioner's arguments herein explain in a rational manner how Bruner, who did not become petitioner's counsel until after petitioner's conviction, could have obtained a *ruling on the record* from the state trial court in the context

of a post-trial motion for new trial on the admissibility of Marin's affidavit for purposes of resolving petitioner's pretrial motions to suppress. By the time Bruner took over as petitioner's counsel, the question of the admissibility of Marin's affidavit in connection with petitioner's pretrial motions to suppress was moot. It was not simply the absence of Marin's affidavit from the state appellate record that led to the Court of Criminal Appeals' holding of procedural default. Rather, it was the absence of any ruling *on the record* by the state trial court that kept Marin's affidavit out of the state appellate record.

exception to Deputy Marin's conduct on February 7, 1986.

The Texas Court of Criminal Appeals could not have overturned petitioner's conviction on direct appeal for any of the reasons set forth in petitioner's fifth, sixth, or seventh points of error without ignoring the Supreme Court's holdings in both *Illinois v. Gates* and *United States v. Leon.* There is no remote possibility, much less a reasonable probability, that the outcome of petitioner's direct appeal would have been different had the Texas Court of Criminal Appeals addressed the merits of petitioner's Fourth Amendment points of error.

### c. *Failure to Raise Jury Misconduct in New Trial Motion*

#### (1) *No Deficient Performance*

■ Assuming that jury misconduct did occur during petitioner's trial, petitioner presented the state habeas court with no fact-specific allegations, much less any evidence, establishing that his appellate counsel had any reason to suspect that such misconduct had occurred. On the contrary, petitioner presented the state habeas court with only a pair of affidavits, one of which was hearsay, implying that petitioner's jury had discussed parole during its deliberations at the punishment phase of petitioner's trial.[55] In response, the State furnished the state habeas court with a set of twelve form affidavits, one from each of petitioner's petit jurors, stating that they had reached their verdicts based solely on the evidence admitted at trial and the law as given by the trial court.[56] Petitioner alleged no specific facts establishing that petitioner's *appellate* counsel, who did not even begin to represent petitioner until after petitioner's jury had been discharged, should have suspected that any improper jury discussions regarding parole occurred during deliberations at the punishment phase of petitioner's trial. Under such circumstances, the state habeas court could reasonably have concluded that the failure of petitioner's appellate counsel to investigate and discover this alleged jury misconduct was nonetheless objectively reasonable. *See Sharp v. Johnson,* 107 F.3d 282, 290 n. 28 (5th Cir.1997) ("Clairvoyance is not a required attribute of effective representation.").

#### (2) *No Prejudice*

■ The state habeas court could also have reasonably concluded that the failure of petitioner's appellate counsel to allege jury misconduct in petitioner's motion for new trial failed to prejudice petitioner within the meaning of *Strickland.* Both parties are in agreement that, as of the date of petitioner's trial, the standard in Texas for obtaining a new trial based on a jury's improper consideration of the defendant's parole eligibility was set forth in *Sneed v. State,* 670 S.W.2d 262, 266 (Tex. Crim.App.1984) (holding that a jury's discussion of parole law in a murder trial constitutes reversible error only if it is shown that there was a misstatement of the law asserted as a fact by one profess-

---

**55.** Petitioner attached to his original state habeas corpus application as exhibits C and D, respectively, the affidavits of (1) former juror John H. Graw, in which Mr. Graw stated in pertinent part that he believed that the two jurors who voted· initially for a life sentence were later convinced to vote for death because of concern that petitioner "could be out in 10 years" if he received a life sentence and (2) a hearsay affidavit from Amanda Bird purporting to explain that former juror Cheryl Bolton had told Bird that petitioner's jury discussed what would happen if petitioner got parole and when petitioner might be eligible for release on parole. State Habeas Transcript at pp. 83–87. The problems with petitioner's attempted reliance on these affidavits are that (1) Mr. Graw's affidavit included no mention of any jury discussion regarding parole and (2) Bird's affidavit was rank hearsay.

**56.** *See* State's Exhibit Nos. 2–13, found in S.F. State Habeas Proceeding, Volume III of III.

ing to know the law that was relied upon by other jurors who for that reason changed their vote to a harsher penalty). The state habeas court could have reasonably concluded that the evidence of jury misconduct proffered by petitioner during his first state habeas corpus proceeding failed to satisfy the *Sneed* standard and, as a result, there was no reasonable probability the outcome of petitioner's motion for new trial or direct appeal would have been different had petitioner's appellate counsel included such a jury misconduct allegation as part of petitioner's motion for new trial.[57]

### d. *Failure to Challenge Definitions of Culpable Mental State in Guilt–Innocence Phase Jury Instructions*

Both parties acknowledge that the definitions of "intentionally" and "knowingly" contained in petitioner's guilt-innocence phase jury instructions were erroneous under then-applicable Texas law. Both parties also agree that petitioner's trial counsel failed to object thereto. What neither party points out, however, is that the state trial court's definitions of the terms "intentionally" and "knowingly" were *verbatim* recitations of the definitions of those terms as set forth in applicable Texas statutes at the time of petitioner's trial.[58] There likewise appears to be no dispute that the "application" paragraph of petitioner's guilt-innocence phase jury instructions correctly instructed the jury under Texas law that it could convict petitioner of capital murder only if it found beyond a reasonable doubt that petitioner had intentionally caused Cruz's death by shooting Cruz with a handgun while in the course of committing or attempting to commit Cruz's kidnaping.

It has been clear in Texas for many years that murder is a "result of conduct" offense. *See, e.g., Cook v. State,* 884 S.W.2d 485, 490–91 (Tex.Crim.App.1994); *Lugo–Lugo v. State,* 650 S.W.2d 72, 81 (Tex.Crim.App.1983). However, as the Texas Court of Criminal Appeals candidly admitted in its opinion in *Cook,* it was far from clear, either at the time of petitioner's trial or during the pendency of petitioner's direct appeal, under precisely what circumstances a Texas trial court's error in failing to limit the definitions of culpable mental states in its jury charge in a capital murder case constituted reversible error. *See Cook,* 884 S.W.2d at 487–89 (discussing the confusing development of Texas law on this subject from *Lugo–Lugo* in 1983 up to the date of that decision in 1994).[59]

**57.** As explained above, Mr. Graw's affidavit failed to even mention the word "parole" and Bird's affidavit was inadmissible hearsay. More importantly, neither Mr. Graw nor the other former juror quoted in Bird's hearsay affidavit offered any fact-specific allegation that (1) any identified juror either professed personal knowledge of Texas parole law, (2) any juror asserted an erroneous interpretation of Texas parole law during deliberations, or (3) any identified juror changed their vote during the deliberations at the punishment phase of petitioner's trial based on that erroneous representation regarding Texas parole law.

**58.** *See* TEXAS PENAL CODE § 6.03(a), (b) (Vernon Supp.2004). The definitions of "intentionally" and "knowingly" contained in

this Texas statutory provision have not changed since they were enacted in 1974.

**59.** More specifically, a year before petitioner's appellate counsel filed petitioner's appellant's brief, the Texas Court of Criminal Appeals opined that *intent to engage in conduct* was an explicit element of intentional murder. *Martinez v. State,* 763 S.W.2d 413, 419 (Tex.Crim.App.1988)(holding that intentional murder is a "result of conduct" offense in that the accused must be found to have intended to engage in the act that caused the death, and also to have specifically intended that death result from that conduct). A year after petitioner filed his appellant's brief, the Texas Court of Criminal Appeals held that a trial court's failure to limit the definitions of culpable mental states to the "result of con-

■ Because petitioner's trial counsel failed to make a timely objection to the erroneous definitions in petitioner's guilt-innocence phase jury instructions, under Texas law, petitioner was entitled to a reversal of his conviction because of his erroneous jury instructions only upon a showing of "egregious harm." *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App. 1984)("[I]f no proper objection was made at trial and the accused must claim the error was 'fundamental,' he will obtain a reversal only if the error is so egregious and created such harm that he 'has not had a fair and impartial trial'—in short 'egregious harm.' "). In making such an assessment, the degree of harm sustained by the defendant must be evaluated in light of the jury charge as a whole, the state of the evidence, the argument of counsel, and any other relevant information in the record. *Id.*

The jury charge at the guilt-innocence phase of petitioner's trial included more than just the erroneous definitions of "intentionally" and "knowingly." The state trial court went on to correctly instruct the jury that it could convict petitioner of capital murder only if it found beyond a reasonable doubt that petitioner had intentionally caused Cruz's death by shooting him with a handgun.[60] The evidence then before petitioner's jury permitted no seri-

ous dispute as to the clearly intentional nature of petitioner's murder of Cruz. Petitioner confessed that he had prepared a shallow grave for Cruz several days before he kidnaped his victim. Petitioner also confessed that he had marched Cruz, blind-folded and handcuffed, to the edge of that grave, deliberately pointed his gun at Cruz's head, and fired his weapon. Other evidence, including the medical examiner's uncontested testimony that Cruz had been shot in the back of the head three times at fairly close range, only served to corroborate petitioner's account of the intentional nature of Cruz's murder.

■ Courts are extremely deferential in scrutinizing the performance of counsel and make every effort to eliminate the distorting effects of hindsight. *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052. Appellate counsel's performance is not deficient solely because of a failure to present every available non-frivolous point of error. *See Robbins*, 528 U.S. at 288, 120 S.Ct. 746 (appellate counsel who files a brief on the merits need not raise every non-frivolous claim but, rather, may select from among them in order to maximize the likelihood of success on appeal). Given the uncertain state of the law in Texas at the time of petitioner's direct appeal, the overwhelming evidence establishing that petitioner

duct," rather than including all the language from the statutory definition, was not error where the jury charge, read as a whole, correctly applied the law to the facts of the case and required the jury to find that the defendant had intentionally caused the death of the decedent. *Kinnamon v. State*, 791 S.W.2d 84, 89 (Tex.Crim.App.1990). The following year, four members of the Texas Court of Criminal Appeals suggested in a concurring opinion on a motion for rehearing that *Kinnamon* had been wrongly decided. *Turner v. State*, 805 S.W.2d 423, 432 (Tex.Crim.App.), *cert. denied*, 502 U.S. 870, 112 S.Ct. 202, 116 L.Ed.2d 162 (1991). Approximately 11 months after it affirmed petitioner's conviction on direct appeal, the Court of Criminal Appeals rejected

language to the contrary in *Martinez* as *dicta*, overruled its holding in *Kinnamon*, and held that a trial court errs if it fails to limit its definitions of the culpable mental states in the jury charge in an intentional murder case to the result of the defendant's conduct. *Cook*, 884 S.W.2d at 490–91. Nonetheless, that *Cook* court went on to hold that a finding of such error was subject to harmless error analysis, in the course of which the reviewing court must determine whether the impact of the erroneously defined culpable mental states was limited by the application portions of the jury charge. *Id.* at 491–92 & n. 6.

60. Trial Transcript at p. 229.

intentionally murdered Cruz, and the failure of petitioner's trial counsel to object to the erroneous definitions in petitioner's guilt-innocence phase jury instructions, the state habeas court could have reasonably concluded that petitioner's appellate counsel made an objectively reasonable, strategic, decision not to present a "fundamental error" challenge to the guilt-innocence phase jury instructions. For similar reasons, the state habeas court could also have reasonably concluded there was no reasonable probability such a fundamental error claim would have prevailed on direct appeal.

Thus, the state habeas court could have reasonably concluded that petitioner's final complaint about his appellate counsel's performance failed to satisfy either prong of the *Strickland* test.

### E. *Perjured Testimony Claim*

#### 1. *The Claim*

■ Petitioner argues that his constitutional rights were violated when prosecution witness Celestino Pardo denied, on cross-examination by petitioner's trial counsel, that he had any personal knowledge of Cruz's murder or that he saw Cruz on the date of the murder.[61]

#### 2. *State Court Disposition*

In support of this contention, petitioner presented the state habeas trial court with testimony from Pardo's estranged wife establishing that Pardo once told her that he and Armando Olivares conspired with petitioner to kidnap and murder Cruz and that he fatally shot Cruz while petitioner was making the telephone call demanding a

ransom for Cruz's release.[62] The state habeas trial court concluded there was no evidence establishing that the prosecution had any knowledge at the time of petitioner's trial that any of Pardo's trial testimony was false or that the prosecution knowingly used perjured testimony to secure petitioner's conviction.[63]

#### 3. *Clearly Established Federal Law*

■ The Supreme Court has held that a state denies a criminal defendant due process when it knowingly uses perjured testimony at trial or allows untrue testimony to go uncorrected. *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Napue v. Illinois*, 360 U.S. 264, 269–70, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). To succeed in showing a due process violation from the use of allegedly perjured testimony, a defendant has the burden of establishing that (1) the witness in question actually gave false testimony, (2) the falsity was material in that there was a reasonable likelihood that it affected the judgment of the jury, and (3) the prosecution used the testimony in question *knowing* that it was false. *Giglio*, 405 U.S. at 153–54, 92 S.Ct. 763.

#### 4. *AEDPA Review*

Petitioner concedes that he presented the state habeas court no evidence, and cannot present to this Court any evidence, showing that any law enforcement agent had any direct knowledge of any alleged perjury by Pardo at petitioner's trial.[64] Nonetheless, petitioner argues that this Court should ignore the Supreme Court's clear holdings in *Giglio* and *Napue* and,

---

**61.** Second Amended Petition at 125–30; Petitioner's Reply at 37; Amended Reply at 44.

**62.** S.F. State Habeas Hearing, Testimony of Belinda Pardo at pp. 15–36. Mrs. Pardo admitted that, prior to that date, she had told no law enforcement officials about her conversa-

tion with her husband and there were no other witnesses to her husband's confession. *Id.*

**63.** State Habeas Transcript at pp. 104–05.

**64.** Second Amended petition at 125–26.

instead, evaluate his complaint regarding Pardo's alleged perjured trial testimony under a standard once-employed, but now long-forgotten, by the Sixth Circuit.[65] Under the AEDPA, however, this Court's role is to determine whether the state habeas court's decision was reasonable under clearly established federal law as determined by the United States Supreme Court. 28 U.S.C. § 2254(d)(1). The state habeas court's rejection on the merits of petitioner's "perjured testimony" complaint was both an objectively reasonable application of the clearly established Supreme Court holdings in *Giglio* and *Napue* and a reasonable determination of the facts based on the evidence before that court.

### F. Constructive Ineffective Assistance Claim

#### 1. The Claim

In his final claim for relief, petitioner argues that the state trial court constructively denied him the effective assistance of trial counsel when it refused to grant the request of petitioner's court-appointed investigator to be discharged midway through trial.[66]

#### 2. State Court Disposition

On December 10, 1986, during the month-long hiatus in the guilt-innocence phase of petitioner's capital murder trial, petitioner's court-appointed defense investigator, Ed Villanueva, filed a motion requesting that he be discharged from further responsibilities in connection with petitioner's case.[67] At a hearing held December 18, 1986, Villanueva testified that (1) he had been appointed to assist petitioner's trial counsel in March 1986, (2) he had been offered a position with the newly-elected Bexar County District Attorney who was taking office on January 1, 1987, (3) he had not divulged any confidential information regarding petitioner's case to the prosecution and would not do so even if hired in the future by the new District Attorney, (4) his potential future hiring by the new District Attorney would not hamper his work for petitioner's trial counsel, and (5) his potential hiring would not take effect until the completion of petitioner's trial.[68] The prosecution represented to the trial court that, regardless of the trial court's disposition of the motion, Villanueva would not be hired until after the completion of petitioner's trial.[69] Petitioner's trial counsel advised the trial court that (1) it did not oppose Villanueva's request, (2) regardless of how the trial court ruled on that motion, the defense would no longer use Villanueva's services in connection with petitioner's trial, and (3) it was requesting a mistrial.[70] The state trial court denied petitioner's motion for mistrial and denied Villanueva's request to be discharged.[71] At no time did petitioner file a formal written

---

**65.** Petitioner argues that the Sixth Circuit opinion in *Jones v. Commonwealth of Kentucky*, 97 F.2d 335, 336–38 (6th Cir.1938), mandates federal habeas relief when a defendant presents evidence showing that a prosecution witness committed perjury during trial. However, the Sixth Circuit itself acknowledged in *Burks v. Egeler*, 512 F.2d 221, 227–29 (6th Cir.), *cert. denied*, 423 U.S. 937, 96 S.Ct. 297, 46 L.Ed.2d 270 (1975), that the Supreme Court's holdings in *Giglio* and *Napue*, and not the rule in *Jones*, had governed the evaluation of similar due process claims in that Circuit for many decades.

**66.** Second Amended Petition at 130–41; Petitioner's Reply at 38; Amended Reply at 44.

**67.** Trial Transcript at pp. 202–03. Significantly, petitioner's trial counsel did not file this motion. Rather, it was filed by petitioner's court-appointed investigator.

**68.** S.F. Trial, Volume XXIII, testimony of Ed Villanueva at pp. 4948–56.

**69.** *Id.*, testimony of Ed Shaughnessy at pp. 4957–60.

**70.** *Id.* at pp. 4962–63.

**71.** *Id.* at p. 4963.

motion, or make an oral motion, asking that Villanueva be replaced as the petitioner's court-appointed investigator.

The issue was raised again in petitioner's motion for new trial.[72] At the hearing held February 19, 1987 on that motion, Villanueva testified that (1) during the extended recess in petitioner's trial, he applied for a position with the newly-elected District Attorney of Bexar County and was assured a position if he could obtain his release from any and all court-appointed duties he was then performing, (2) after the hearing on December 18, 1986 on his motion to be discharged, he did no further work for petitioner's trial counsel, (3) until that date, he had done all investigative work requested by petitioner's trial counsel, (4) he had never revealed any confidential information obtained during his court-appointed investigative work to anyone other than counsel for the parties whom he had been appointed to assist and would never do so, and (5) after the state trial court denied his motion to be discharged, he did not begin working for the District Attorney's office until after petitioner's trial was completed, i.e., on January 16, 1987[73]. Petitioner's former trial counsel testified at the same hearing that (1) he wanted Villanueva discharged in December, 1986 to avoid even the appearance of impropriety, (2) because the state trial court did not discharge Villanueva, he did not employ Villanueva's services after the hearing on December 18, 1986, (3) Villanueva's performance between March and December 1986 had been satisfactory, (4) he was not accusing Villanueva of any impropriety, but (5) he believed it was crucial for him and his co-counsel to have had the assistance of an investigator during the punishment phase of petitioner's trial.[74] The state trial court denied petitioner's motion for new trial.[75]

Petitioner presented a complaint about the state trial court's refusal to appoint a new investigator for petitioner in his first state habeas corpus application.[76] The state habeas trial court found that (1) petitioner's trial counsel never requested the appointment of a new investigator, (2) Villanueva maintained the confidentiality of all communications between himself and petitioner's trial counsel, (3) prior to December 18, 1986, Villanueva completed all investigatory work requested of him by petitioner's trial counsel, (4) thereafter petitioner's defense team ceased utilizing Villanueva's services, and (5) as a result, petitioner's trial counsel were forced to "track down" the prosecution's punishment phase witnesses without the assistance of an investigator.[77] The habeas trial court concluded that petitioner had failed to demonstrate that he suffered any harm as a result of his trial counsel's decision to stop utilizing Villanueva's services and, therefore, petitioner could not satisfy the prejudice prong of *Strickland.*[78]

### 3. *Procedural Default*

■ Petitioner argues that the state habeas court's application of the dual

---

72. Trial Transcript at pp. 260–61.

73. S.F. Trial, Volume XXIX, testimony of Ed Villanueva at pp. 6082–94.

74. *Id.,* testimony of Hippolito (Paul) Canales at pp. 6095–6101.

75. *Id.* at p. 6120.

76. State Habeas Transcript at pp. 17–20. As respondent correctly points out, petitioner's first state habeas corpus application included

no mention of the Supreme Court's holdings in *Cuyler v. Sullivan* or *United States v. Cronic* nor any arguments similar to those petitioner presents to this Court in his Second Amended Petition based on those two opinions.

77. State Habeas Transcript at pp. 106–07.

78. *Id.* at p. 108.

prongs of *Strickland* to his claim was erroneous and that he is entitled to a presumption of prejudice under the Supreme Court's holdings in *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), and *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). Respondent points out, however, that petitioner wholly failed to include any mention of either of his *Cronic* or *Cuyler* theories of relief in his first state habeas corpus application. Thus, respondent is correct that petitioner failed to "fairly present" these claims to the state habeas court and that this failure renders petitioner's *Cronic* and *Cuyler* theories both unexhausted and procedurally defaulted. *Coleman*, 501 U.S. at 735 n. 1, 111 S.Ct. 2546.

This Court is authorized, however, to deny relief on unexhausted claims that lack merit. 28 U.S.C. § 2254(b)(2). The Supreme Court's opinions in *Cuyler* and *Cronic* do not support petitioner's final claim herein. In fact, the holdings in those two cases are wholly consistent with the state habeas court's rejection of this claim on the merits. In *Cuyler*, the Supreme Court held that a defendant complaining of multiple representations by his counsel is entitled to no relief unless he can show that his counsel actively represented conflicting interests. *Cuyler*, 446 U.S. at 349–50, 100 S.Ct. 1708. It is undisputed that Villanueva did not begin to work for the Bexar County District Attorney's office until *after* petitioner's trial was completed. Thus, Villanueva's potential conflict of interest never blossomed into an *actual* conflict of interest. Likewise, in *Cronic*, the Supreme Court rejected an argument similar to that raised in petition-

er's final claim herein when it held that neither a trial counsel's inexperience, youth, the relatively short period of time said counsel had to prepare, the inaccessibility of witnesses, the complexity of the case, nor the gravity of the charge justified a presumption of prejudice. *Cronic*, 466 U.S. at 662–66, 104 S.Ct. 2039.

The United States Supreme Court has never held that court-appointment of an investigator is a necessary concomitant to effective representation in a criminal proceeding. Nor has the Supreme Court ever held that a criminal defendant possesses a constitutionally protected right to the assistance of an investigator of his own choosing. Nor would such rules be of any benefit to petitioner because the state habeas court correctly found that petitioner never requested that Villanueva be discharged or replaced. Villanueva never operated under an actual conflict of interest while working for petitioner. Nor has petitioner identified any state action that prevented or impaired Villanueva's ability to assist petitioner's trial counsel throughout the entirety of petitioner's trial.[79] Under such circumstances, petitioner is entitled to no presumption of prejudice under either *Cuyler* or *Cronic*.

### 4. AEDPA Review

The federal constitutional claim that petitioner did fairly present to the state habeas court focused on the Supreme Court's opinion in *Ake v. Oklahoma*, 470 U.S. 68, 83, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) (holding that, when a defendant demonstrates that his sanity at the time of the offense is to be a significant factor at trial,

---

**79.** Insofar as petitioner complains that he was denied Villanueva's assistance during the punishment phase of his capital murder trial, petitioner's complaint should have been directed toward his trial counsel, who made the deliberate decision not to utilize Villanueva's assistance after December 18, 1986. The

state trial court did everything in its power to assure that petitioner would have Villanueva's assistance throughout the duration of trial. Moreover, the state trial court was never faced with any formal request from petitioner's trial counsel to have Villanueva replaced.

the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense). The Supreme Court made clear that the constitutional right it recognized in *Ake* did not guarantee the defendant a right to choose a psychiatrist or to receive funds to retain his own. *Id.*

■■■ The state habeas court reasonably found based on the evidence then before it that petitioner's trial counsel never requested the state trial court to discharge or replace Villanueva. This Court's independent review of the entirety of the record from petitioner's trial court proceeding leads to the inescapable conclusion that this factual determination was eminently reasonable. Thus, the state trial court never deprived petitioner of the assistance of a court-appointed investigator. Rather, petitioner's trial counsel made a deliberate decision not to utilize Villanueva's assistance after December 18, 1986.

The state trial court cannot be faulted for denying Villanueva's motion seeking discharge. Under the circumstances, that denial was clearly designed to ensure that petitioner would have Villanueva's assistance for the duration of petitioner's trial. Even assuming that petitioner possessed a protected right to the assistance of a court-appointed investigator, petitioner did not possess a constitutional right to the assistance of a court-appointed investigator of petitioner's own choosing. *Id.*

Furthermore, a request for the assistance of a court-appointed investigator to locate and interview witnesses is qualitatively different from a request for the assistance of an expert to help the defense prepare to face similar expert testimony offered by the prosecution. There is no clearly established federal law, as enunciated by the Supreme Court, extending the holding in *Ake* beyond a recognition of the need for *expert* assistance when the defendant has demonstrated a legitimate need for such. *See Briseno v. Cockrell,* 274 F.3d 204, 208–10 (5th Cir.2001)(recognizing that it remains an unsettled question whether the holding in *Ake* applies to requests for expert assistance outside the field of psychiatry).

Recently, the Supreme Court has held that a criminal defendant is entitled to a presumption of prejudice in only extraordinary situations, none of which even remotely approach the facts surrounding the state trial court's non-discharge of Villanueva. *See Bell,* 535 U.S. at 695–97, 122 S.Ct. 1843 (holding a presumption of prejudice applies only when there has been a complete denial of counsel, when counsel entirely failed to subject the prosecution's case to meaningful adversarial testing, or circumstances rendered even competent counsel unlikely to be able to perform effectively); *Robbins,* 528 U.S. at 287, 120 S.Ct. 746 (holding that a presumption of prejudice applies only when there has been a complete denial of counsel, there has been state interference with counsel's assistance, or counsel is burdened by an actual conflict of interest). Because the state trial court's non-discharge of Villanueva neither deprived petitioner of a clearly established federal constitutional right nor falls into any category of situations in which the Supreme Court has recognized the applicability of a presumption of prejudice, the state habeas court's application of the dual prongs of *Strickland* to petitioner's complaint regarding the trial court's non-discharge of Villanueva, and its impact on his defense, was an objectively reasonable application of clearly established federal law. *See Bell,* 535 U.S. at 698, 122 S.Ct. 1843 (holding that a state court correctly applied the principles of *Strickland* in evaluating the performance of trial counsel accused of

having performed deficiently at the punishment phase of a capital murder trial).

Likewise, the state habeas court reasonably determined from the record before it that petitioner had made no showing that he was "prejudiced" within the meaning of *Strickland* by his trial counsel's decision not to utilize Villanueva's assistance following December 18, 1986. While petitioner's trial counsel complained during the hearing on petitioner's motion for new trial that he and his co-counsel were forced by their own decision not to utilize Villanueva to "track down" and interview the prosecution's punishment-phase witnesses, said counsel failed to identify any such witness petitioner's defense team was unable to locate or interview. Nor did petitioner identify for the state habeas court any other persons who might have been able to furnish mitigating evidence or other testimony favorable to petitioner whom petitioner's trial counsel were unable to locate because of their decision not to utilize Villanueva's services after December 18, 1986. Petitioner's trial counsel identified no prosecution evidence or prosecution testimony presented at the punishment phase of trial which came as a surprise to petitioner's defense team. Finally, this Court's independent review of the punishment-phase of petitioner's trial reveals that all of the prosecution's witnesses gave testimony regarding specific instances of misconduct on petitioner's part. All such testimony was necessarily within petitioner's personal knowledge and accessible to petitioner's defense team through interviews of their own client. Under such circumstances, the state habeas court reasonably concluded that petitioner was not prejudiced within the meaning of *Strickland* by either the state trial court's non-discharge of Villanueva or petitioner's trial counsel's decision not to utilize Villanueva's services after December 18, 1986.

## III. Motion for Leave of Court to File Supplemental Claim

Petitioner has also filed a motion for leave to file a supplemental claim based on the Supreme Court's recent decision in *Roper v. Simmons,* —— U.S. ——, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005). The Court grants the motion for leave to file. In his supplemental claim, Petitioner argues that although he committed the murder when he was age eighteen, the *mens rea* to commit the murder was formed when he was seventeen years of age.[80] Petitioner argues that Roper's prohibition on the execution of juvenile offenders should apply to him as well. In *Roper*, the murderer was seventeen years of age when he committed the act. Nine months later, after he had turned 18, he was tried and sentenced to death. *Id.* at 1187. This Court rejects Petitioner's request to extend *Roper.* The Supreme Court has drawn a line and has stated that "The Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed." *Id.* at 1200. Despite the fact that Petitioner may have engaged in certain preparatory acts while he was seventeen years of age, the undisputed fact remains that he committed the murder when he was eighteen years of age. The forming of the mens rea alone was not the criminal act. Petitioner was eighteen years of age when the crime of murder was committed and the evidence demonstrates that he was sufficiently mature at the time of the murderous act. Petitioner's argument would eviscerate the

---

**80.** Petitioner "carefully plotted for months to abduct and kill someone for money. After targeting John Cruz for his murder scheme, [Moreno] started making plans on how to go about kidnaping him, getting the money and then killing him."

bright line drawn by the Supreme Court. "Drawing the line at 18 years of age is subject, of course, to the objections always raised against categorical rules. The qualities that distinguish juveniles from adults do not disappear when an individual turns 18. By the same token, some under 18 have already attained a level of maturity some adults will never reach. For the reasons we have discussed, however, a line must be drawn. The plurality opinion in *Thompson* drew the line at 16. In the intervening years the *Thompson* plurality's conclusion that offenders under 16 may not be executed has not been challenged. The logic of *Thompson* extends to those who are under 18. The age of 18 is the point where society draws the line for many purposes between childhood and adulthood. It is, we conclude, the age at which the line for death eligibility ought to rest." *Id.* at 1197–98.

## IV. *Certificate of Appealability*

 Under the AEDPA, before a petitioner may appeal the denial of a habeas corpus petition filed under Section 2254, the petitioner must obtain a "Certificate of Appealability" ("CoA"). *Miller–El v. Cockrell,* 537 U.S. 322, 335–36, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003); 28 U.S.C § 2253(c)(2). Under the AEDPA, appellate review of a habeas petition is limited to the issues on which a CoA is granted. *See Crutcher v. Cockrell,* 301 F.3d 656, 658 n. 10 (5th Cir.2002), (holding that a CoA is granted on an issue-by-issue basis, thereby limiting appellate review to those issues). In other words, a CoA is granted or denied on an issue-by-issue basis, thereby limiting appellate review to those issues on which CoA is granted alone. *Id.*

 A CoA will not be granted unless the petitioner makes a substantial showing of the denial of a constitutional right. *Tennard v. Dretke,* —— U.S. ——, ——, 124 S.Ct. 2562, 2569, 159 L.Ed.2d 384

(2004). To make such a showing, the petitioner need *not* show that he will prevail on the merits but, rather, demonstrate that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented are adequate to deserve encouragement to proceed further. *Tennard,* —— U.S. at ——, 124 S.Ct. at 2569. This Court is authorized to address the propriety of granting a CoA *sua sponte. Alexander v. Johnson,* 211 F.3d 895, 898 (5th Cir.2000).

The showing necessary to obtain a CoA on a particular claim is dependent upon the manner in which the District Court has disposed of a claim. If this Court rejects a prisoner's constitutional claim on the merits, the petitioner must demonstrate that reasonable jurists could find the court's assessment of the constitutional claim to be debatable or wrong. *Miller–El,* 537 U.S. at 338, 123 S.Ct. 1029 ("[W]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."). In a case in which the petitioner wishes to challenge on appeal this Court's dismissal of a claim for a reason not of constitutional dimension, such as procedural default, limitations, or lack of exhaustion, the petitioner must show that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* whether this Court was correct in its procedural ruling. *Slack v. McDaniel,* 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000) (holding that when a district court denies a habeas claim on procedural grounds, without reaching the underlying constitutional claim, a CoA may issue only when the

petitioner shows that reasonable jurists would find it debatable whether (1) the claim is a valid assertion of the denial of a constitutional right and (2) the district court's procedural ruling was correct).

 Viewed in proper context, there is no basis for disagreement among jurists of reason with regard to this Court's disposition of any of petitioner's claims herein. Petitioner's assertion that he is mentally retarded is fully refuted by the record from his trial and unsupported by any fact-specific allegations showing petitioner ever suffered any identifiable cognitive deficit or adaptive skill deficiency prior to age 18. Petitioner's Fourth Amendment claim is barred from federal review by *Stone*, is procedurally defaulted, and is premised entirely on the rejected *Aguilar–Spinelli* standard. Furthermore, petitioner's proffered Fourth Amendment analysis ignores the Supreme Court's recognition in *Leon* of a good-faith exception to the exclusionary rule. None of petitioner's complaints about the performance of his appellate counsel satisfy either prong of *Strickland.* Petitioner alleged no facts showing the State had any basis for knowing or even suspecting that Celestino Pardo's trial testimony was in any manner inaccurate. Petitioner's constructive ineffective assistance claim is foreclosed not only by the Supreme Court's recent holding in *Bell v. Cone (I)* but also by the very Supreme Court opinions on which petitioner relies, *i.e., Cuyler* and *Cronic.* Petitioner is not entitled to a CoA from this Court.

Accordingly, it is hereby **ORDERED** that:

1. All relief requested in petitioner's Second Amended Petition[81] is **DENIED**. Defendant's motions for summary judgment (docket nos. 13 and 51) are **GRANTED**.

2. Petitioner's motion for leave to file a supplemental claim (docket no. 62) is **GRANTED**, but as discussed above the requested relief is **DENIED**.

3. Petitioner is **DENIED** a Certificate of Appealability.

4. All other pending motions are **DISMISSED** as moot.

5. The Clerk shall prepare and enter a Judgment in conformity with this Memorandum Opinion and Order.